**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

ORVILLE SCHUSTER, SCHUSTER
CO., LEMARS TRUCK & TRAILER,
INC. and WILLIAM SCHLICHTE,

              Plaintiffs,

vs.

FAY ANDERSON, F.H. ANDERSON
COMPANY, P.C., F.H. ANDERSON
COMPANY, CARL ANDERSON,
ANDERSON ACCOUNTING & TAX
SERVICES, INC., CAL CLEVERINGA
and AMERICAN STATE BANK,

              Defendants.

No. C04-4089-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTIONS TO
DISMISS AND PLAINTIFF
SCHUSTER'S MOTION FOR LEAVE
TO FILE A THIRD AMENDED AND
SUBSTITUTED COMPLAINT**

---

**TABLE OF CONTENTS**

**I. INTRODUCTION AND BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      *1. Relationships of the parties* . . . . . . . . . . . . . . . . 8
      *2. Yournet related entities & the Witherspoon affair* . . . . . . . . 9
      *3. Plaintiffs' investments in Yournet related entities and the
         Witherspoon affair* . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *A. Rule 12(b)(6) Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *B. Civil RICO Claims—Counts XIV-XVI* . . . . . . . . . . . . . . . . . . . . 18

*1.*      *The RICO claims generally* . . . . . . . . . . . . . . . . . . . . . 18
*2.*      *Pleading fraud with particularity* . . . . . . . . . . . . . . . . . 20
     *a.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . 20
     *b.*     *The law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     *c.*     *The Complaint* . . . . . . . . . . . . . . . . . . . . . . . 27
     *d.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        *i*      *Wire transfers* . . . . . . . . . . . . . . . . . . . 28
        *ii.*     *Circumstance constituting fraud* . . . . . . . . 34
*3.*      *Pleading the "enterprise" requirement* . . . . . . . . . . . . . 38
     *a.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . 38
     *b.*     *The law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
     *c.*     *The Complaint* . . . . . . . . . . . . . . . . . . . . . . . 42
     *d.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*4.*      *Respondeat superior theory of liability against ASB* . . . . . 46
     *a.*     *Arguments of the parties* . . . . . . . . . . . . . . . . . . 46
     *b.*     *The law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
     *c.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
*5.*      Ultimate disposition of RICO claims . . . . . . . . . . . . . . . 58
*C.* Breach of Fiduciary Duty Claims—Counts IV & XX . . . . . . . . . . . 59
    *1.*      The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    *2.*      Arguments of the parties . . . . . . . . . . . . . . . . . . . . 60
    *3.*      Breach of fiduciary duty under Iowa law . . . . . . . . . . . 63
    *4.*      Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
*D.* Fraudulent Misrepresentation And Fraudulent
    Nondisclosure—Counts VI & VII . . . . . . . . . . . . . . . . . . . . . . . 67
    *1.*      The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    *2.*      Arguments of the parties . . . . . . . . . . . . . . . . . . . . 69
    *3.*      Fraudulent misrepresentation and fraudulent nondisclosure
        under Iowa law . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    *4.*      Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
*E.* Subject Matter Jurisdiction—Counts I, II & III . . . . . . . . . . . . . . 75
    *1.*      The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
    *2.*      General law regarding subject matter jurisdiction . . . . . . 76
    *3.*      Arguments of the parties . . . . . . . . . . . . . . . . . . . . 78
     *a.*     Arguments for dismissal . . . . . . . . . . . . . . . . . . 78
        *i.*     The Carl Anderson defendants . . . . . . . . . . 78
        *ii.*     The Anderson defendants . . . . . . . . . . . . . 79

   *b.*  **The plaintiffs' arguments in resistance** . . . . . . . . . . 81
   *c.*  **The Anderson, and Carl Anderson, defendants'**
     **reply** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
  ***4.*  Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
 **F. Plaintiff Schuster's Motion For Leave To Amend** . . . . . . . . . . . . . 90

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On September 21, 2004, plaintiffs Orville Schuster ("Schuster") and William Schlichte ("Schlichte") filed a complaint against defendants American State Bank ("ASB"), Cal Cleveringa ("Cleveringa") and Fay Anderson ("Anderson") alleging ten causes of action. (Doc. No. 2). The defendants each proceeded to file motions to dismiss in October and early November 2004. (Doc. Nos. 9, 10, 14). Following several extensions of time in which to file their resistances, as well as the withdrawal of counsel due to conflicts of interest with the defendants, a status conference was held by United States Magistrate Judge Paul A. Zoss. Following the status conference, Judge Zoss ordered that issues surrounding Schlichte's legal representation be resolved by February 1, 2005, giving the plaintiffs until February 15, 2005, in which to file amended complaints, and denying the outstanding motions to dismiss without prejudice. (Doc. No. 42). On February 15, 2005, Schuster, Schlichte and newly-added plaintiffs Schuster Co. and Lemars Truck & Trailer, Inc.("LTT"), filed a Second Amended and Substituted Complaint ("Complaint") which alleged twenty counts against original defendants Anderson, Cleveringa and ASB, as well as newly added defendants F.H. Anderson Company, P.C., F.H. Anderson Company,

Carl Anderson, Anderson Accounting & Tax Services, Inc., and William & Company, C.P.A. (Doc. No. 44). The twenty causes of action asserted are as follows:

I. Schuster's professional negligence claim against defendants Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

II. Schuster Co.'s professional negligence claim against defendants Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Carl Anderson, and Anderson Accounting & Tax Services, Inc.;

III. LTT's professional negligence claim against Carl Anderson and Anderson Accounting & Tax Services, Inc.;

IV. Schuster's breach of fiduciary duty claim against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

V. Schuster and Schlichte's breach of fiduciary duty claim against Cleveringa and ASB;

VI. Schuster's claim for fraudulent misrepresentation against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

VII. Schuster's fraudulent nondisclosure claim against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

VIII. Schuster and Schlichte's fraudulent misrepresentation claim against Cleveringa and ASB;

IX. Schuster and Schlichte's fraudulent nondisclosure claim against Cleveringa and ASB;

X. Schuster's claim for negligent misrepresentation against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

XI. Schuster and Schlichte's negligent misrepresentation claim against Cleveringa and ASB;

XII.    Schuster and Schlichte's claim for fraud in the inducement based on fraudulent misrepresentations by ASB;

XIII.   Schuster and Schlichte's claim for fraud in the inducement based on fraudulent nondisclosures;

XIV.    Schuster and Schlichte's claim of an 18 U.S.C. § 1962(b)-Racketeer Influenced and Corrupt Organizations Act ("RICO") violation by Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Cleveringa and ASB;

XV.     Schuster and Schlichte's claim of an 18 U.S.C. § 1962(c)-RICO violation by Anderson, F.H. Anderson Company, P.C. F.H. Anderson Company, Cleveringa and ASB;

XVI.    Schuster and Schlichte's claim of an 18 U.S.C. § 1962(d)-RICO violation by Anderson, F.H. Anderson Company, P.C. F.H. Anderson Company, Cleveringa and ASB;

XVII.   Schuster and Schlichte's claim for negligent supervision against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company;

XVIII.  Schuster and Schlichte's negligent supervision claim against ASB;

XIX.    Schlichte's breach of contract claim against Anderson;

XX.     Schlichte's breach of fiduciary duty claim against Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company.

The Complaint alleges that this court has subject matter jurisdiction by virtue of federal question jurisdiction, 28 U.S.C. § 1331, in light of the RICO claims, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims. On February 23, 2003, the plaintiffs filed a notice of voluntary dismissal of defendant Williams & Company, C.P.A. (Doc. No. 45). On March 16, 2005, defendants Carl Anderson and Anderson Accounting

& Tax Services, Inc. filed a Motion to Dismiss Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX and XX of Plaintiffs' Second Amended and Substituted Complaint Pursuant to F.R.C.P. 12(h)(2)(3) (sic). (Doc. No. 52). Specifically, Carl Anderson and Anderson Accounting & Tax Services, Inc. assert that Counts I, and IV-XX should be dismissed for failure to state a claim upon which relief can be granted, and that Counts II and III should be dismissed for lack of subject matter jurisdiction. On March 17, 2005, defendant Cleveringa filed a Renewed Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(B)(6), asserting that the RICO counts embodied in Counts XIV-XVI should be dismissed for failure to be plead with the particularity required by Federal Rule of Civil Procedure 9(b), and that as dismissal of the RICO claims would divest this court of subject matter jurisdiction, the remaining claims should likewise be dismissed. (Doc. No. 54). Also on March 17, 2005, defendant ASB filed a Renewed Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6), which requested dismissal of Counts XIV-XVI with prejudice for failure to plead with particularity under Rule 9(b), and dismissal of the remaining counts without prejudice due to want of subject matter jurisdiction. (Doc. No. 55). Also on March 17, 2005, defendants Anderson, F.H. Anderson Company, P.C., and F.H. Anderson Company filed a Renewed Motion to Dismiss requesting dismissal of Counts I, II, IV, VI, VII, XIV, XV, and XVI with prejudice, and the remaining counts without prejudice for the various reasons outlined in their brief. (Doc. No. 55). The plaintiffs filed a combined resistance to all of the defendants' motions to dismiss on April 4, 2005. (Doc. No. 58). Carl Anderson and Anderson Accounting & Tax Services, Inc., filed a reply on April 11, 2005. (Doc. No. 62). Anderson, F.H. Anderson Company, P.C., and F.H. Anderson Company filed a reply on April 12, 2005. (Doc. No. 64). ASB filed its reply on April 13, 2005. (Doc. No. 66). On May 3, 2005, the matter was reassigned to United States District Court Judge

Robert W. Pratt for the Southern District of Iowa, out of an abundance of caution, as a juror selected for a criminal trial pending before the undersigned was related to a litigant in this matter. (Doc. No. 68). On June 21, 2005, following the completion of the criminal trial, this matter was transferred back to the undersigned and oral argument on the still-pending motions to dismiss was set. (Doc. No. 69). Oral argument on the defendants' motions to dismiss was held on June 30, 2005. At oral argument plaintiffs Schuster, Schuster Co., and LTT were represented by Terrence D. Brown of Hixson & Brown, P.C., in Clive, Iowa. Plaintiff Schlichte was represented by Timothy A. Clausen of Klass Stoik Mugan Villone Phillips Orzechowski Clausen & Lapierre L.L.P. in Sioux City, Iowa. ASB was represented by Edward M. Mansfield of Belin Lamson McCormick Zumback Flynn in Des Moines, Iowa, and Lloyd Bierma of Oostra Bierma & Schouten in Sioux Center, Iowa. Cleveringa was represented by John C. Gray of Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl, L.L.P., in Sioux City, Iowa. Anderson, F.H. Anderson Company, P.C., and F.H. Anderson Company were represented by Robert Keith of Engles, Ketchum, Olson & Keith, P.C., in Omaha, Nebraska. Defendants Carl Anderson and Anderson Accounting & Tax Services, Inc. were represented by Michael R. Hellige of Hellige, Frey & Roe in Sioux City, Iowa. A bench trial in this matter is currently scheduled for July 31, 2006.

## B. Factual Background

On a motion to dismiss, the court must assume all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Therefore, the following factual background is drawn from the plaintiffs' Complaint in such a manner.

## 1.    *Relationships of the parties*

Defendant Anderson had acted as an accountant for Schuster, individually, and for Schuster's businesses—plaintiffs LTT and Schuster Co.—for over twenty years.   As Schuster's accountant, Anderson routinely provided investment advice to Schuster and encouraged Schuster to invest his personal funds, or funds Schuster secured by bank loans, in particular investments.  Anderson was aware that Schuster had suffered a stroke, and that it impaired his judgment and made him more susceptible to suggestion.  Further, Anderson knew or should have known, from Schuster's mannerisms and reactions, that Schuster trusted Anderson implicitly.  Anderson also provided Schlichte with investment advice, and used his relationship with Schuster as leverage to entice Schlichte into making certain investments.  Anderson, at all relevant times, was an employee, agent and/or owner of defendants F.H. Anderson Company, P.C. and F.H. Anderson Company.

Over a significant period of time, Cleveringa—who was Vice President of defendant ASB—also recommended certain investment options to the plaintiffs.  Cleveringa was encouraged by senior management at ASB to locate credit-worthy borrowers for the purpose of extending personal and/or business loans to generate interest income for ASB. Cleveringa routinely advised that Schuster's assets, Schlichte's assets, or funds available via ASB loans to Schuster, be invested in entities in which Anderson had an interest. Schuster and Schlichte trusted Cleveringa—which was evinced by their mannerisms and lack of questioning of his judgment.  Cleveringa and ASB were aware that Schuster had suffered a stroke and that it made him more susceptible to suggestion.  Schlichte and ASB had a relationship spanning twenty-five years—as Schlichte maintained accounts, a line of credit and loans with ASB for the purpose of making investments.  On eleven occasions between November 2000 and December 2002, ASB loaned money to Schuster for investment purposes, with the aggregate loan amount of approximately $2,121,077.67.

Between May 2001 and February 15, 2005, Schuster has paid in excess of $475,122.32 in interest on these loans. In January 2004, ASB insisted that Schuster pay $785,912.85 on his outstanding loans through the cashing of his certificates of deposit, or by writing a check to ASB for that amount. Schuster made the payment, which resulted in a loss of his certificates of deposit.

Defendant Carl Anderson is an accountant, and is likewise an employee, agent and/or owner of F.H. Anderson Company, P.C., F.H. Anderson Company and Anderson Accounting & Tax Services, Inc.

### 2.    *Yournet related entities & the Witherspoon affair*

Cleveringa, Anderson, non-defendant Chuck Hinnenkamp ("Hinnenkamp") and other known and unknown individuals created a number of legal entities as investment vehicles. The Complaint alleges that all of these entities were created as part of a conspiracy to defraud investors generally, and the plaintiffs in particular. The entities listed as part of this fraudulent scheme, hereafter referred to in the aggregate as the "Yournet related entities," are as follows:

- Creative Marketing & Communications, Inc.("Creative Marketing")—formed around March 24, 1997; Cleveringa was an officer, director and shareholder in Creative Marketing, and Anderson held an ownership interest in the entity.

- Team Link L.L.C. ("Team Link")—combined with Creative Marketing in late 1998.

- World Wide Furniture Net, a/k/a WWFN ("WWFN")—Anderson had a financial interest in WWFN.

- Yournet—formed around October 1, 1998; shortly after its formation, the "net assets" of WWFN were transferred to Yournet in exchange for issuance of stock in Yournet to Anderson and Hinnenkamp.

9

- Quan Capital Corporation—formed around November 7, 2000.

- R-Chief

- Zaba Industries

Complaint, Doc. No. 44, at pp. 8-9, ¶¶ 42-48. ASB maintained several accounts for the Yournet related entities—specifically, Yournet, WWFN, and R-Chief. Cleveringa was the ASB officer responsible for each of these accounts. ASB's senior management was, or should have been, aware of the Yournet related entities' activity due to: (1) the volume of funds flowing through the Yournet related entities' accounts; (2) the fact that the accounts were overdrawn on more than one occasion; (3) Cleveringa devoted a significant number of working hours to the Yournet related entities' accounts; (4) tax liens served on ASB in July 2002 for Yournet's unpaid tax obligations; and (5) notice sent to ASB on August 30, 2003, by the United States Bankruptcy Court for the District of Minnesota that Yournet had filed for bankruptcy around July 25, 2002.

During September 2002, ASB, Cleveringa and Anderson presented an investment opportunity to Schuster and Schlichte relating to investment in an alleged $600 million jury verdict awarded to Darryl[1] Witherspoon ("Witherspoon affair"). The purpose presented for the investment was to cover future expenses related to the lawsuit, with a promised return of between 500% and 1,000%. Cleveringa, Anderson and ASB had a financial interest in the Witherspoon affair by virtue of a series of promissory notes, executed by Darryl Witherspoon and/or Russ Barber, made payable to Creative Marketing. The

---

[1]The Complaint spells this individual's first name in two different manners: Darryl and Darrell. Complaint at ¶¶ 53, 55. The court assumes these are the same individual, and randomly selected the first proffered spelling as that which it would use in this opinion.

Complaint contends that at the time Cleveringa, Anderson and ASB recommended the Witherspoon affair as an investment to Schlichte and Schuster, they knew or should have known that this investment opportunity was a fraud.

### 3. *Plaintiffs' investments in Yournet related entities and the Witherspoon affair*

Between approximately October 10, 1997, and early 2004, Cleveringa and Anderson induced Schuster to make significant "investments" in the Yournet related entities and the Witherspoon affair, as follows:[2]

- October 10, 1997—$27,000 in Team Ink.

- February 23, 1998—$50,000 in Team Ink.

- December 19, 1998—$30,000 in WWFN, of which Anderson converted $5,000 for his own personal use.

- March 3, 1999—$25,000 in WWFN.

- July 8, 1999—$200,000 in Yournet.

- March 18, 2000—$10,000 in Yournet.

- June 20, 2000—$100,000 in Yournet. Funds were deposited into the R-Chief account at ASB, with $50,000 remitted to Yournet and the balance converted by Anderson for his own personal use.

- September 28, 2000—$25,000 in Yournet.

- January 22, 2001—$50,000 in Yournet.

- May 17, 2001—$50,000 in Yournet.

- July 20, 2001—$33,373 in Yournet.

- September 20, 2001—$12,000 in Yournet; entire amount converted by

---

[2]Dates of the alleged investments are approximate.

Anderson for his own personal use.

- November 13, 2001—$50,000 in Yournet; entire amount converted by Anderson for his own personal use.

- December 27, 2001—$15,000 in Yournet; entire amount converted by Anderson for his own personal use.

- April 2, 2002—$75,000 in Zaba Industries.

- June 28, 2002—$60,000 in R-Chief.

- July 11, 2002—$25,000 in Yournet.

- August 15, 2002—$15,000 in Zaba Industries.

- October 8, 2002—$30,000 in the Witherspoon affair.

- October 29, 2002—$50,000 in R-Chief and/or the Witherspoon affair.

- November 15, 2002—$300,000 in R-Chief and/or the Witherspoon affair.

- May 22, 2003—$17,000 in Zaba Industries.

- June 9, 2003—$50,000 in Zaba Industries.

- August 19, 2003—$10,000 in Zaba Industries.

- September 16, 2003—$60,000 in an unknown investment through Anderson.

- January 15, 2004—$170,000 in an unknown investment through Anderson.

In order to make a number of these investments, Schuster secured eleven loans[3] through

---

[3]Specifically the following loans were procured by Schuster through ASB for purposes of the investments listed (dates are approximate):
- November 1, 2000—$692,889.12
- December 12, 2000—$200,000.00
- July 2, 2001—$211,000.00
- November 8, 2001—$692,889.12
- February 6, 2002—$600,000.00
- May 15, 2002—$725,000.00

(continued…)

ASB—with Cleveringa acting as the loan officer. Additionally, Schuster pledged certain assets as collateral to ASB—specifically: (1) February 6, 2002—a warehouse and real estate worth at least $1,750,000 in order to obtain a new loan from ASB; (2) October 25, 2002—$692,889.12 in certificates of deposit as security on loans then owing to ASB; and (3) October 25, 2002—all of Schuster's personal assets on loans then owing to ASB. Schuster's total investment in the Yournet related entities and the Witherspoon affair was $1,748,873.80. Complaint at ¶ 62.

Cleveringa, Anderson and ASB also induced Schlichte to make the following investments in the Yournet related entities and the Witherspoon affair:[4]

- February 28, 1997—$15,000 in Creative Marketing.
- June 17, 1997—$10,000 in Creative Marketing.
- November 25, 1997—$5,000 in Creative Marketing.
- February 13, 1998—$2,000 in Creative Marketing.
- October 29, 1998—$25,000 in Sports Mailbox, a fraudulent entity in which Cleveringa held an ownership interest.
- October 18, 1999—$50,000 in Sports Mailbox.
- May 3, 2000—$15,000 in Yournet.
- February 4, 2001—$100,000 (entity not listed).

---

[3](...continued)
- July 30, 2002—$50,000.00
- August 26, 2002—$1,200,000.00
- October 3, 2002—$100,000.00
- October 25, 2002—$100,000.00
- December 31, 2002—$130,000.00

Complaint at ¶ 57.

[4]Dates of the alleged investments are approximate.

- April 5, 2001—$5,000 in Sports Mailbox.

- July 27, 2001—$5,000 in Sports Mailbox.

- October 12, 2001—$5,000 in Sports Mailbox.

- October 17, 2001—$120,000 in Sports Mailbox.

- October 18, 2001—$15,000 in Sports Mailbox.

- November 5, 2002—$50,000 in Creative Marketing.

- December 18, 2002—$50,000 in R-Chief.

- January 30, 2003—$175,000 in the Witherspoon affair.

- February 14, 2003—$4,000 in Creative Marketing.

- March 17, 2003—$130,000 in the Witherspoon affair.

- April 11, 2003—$14,500 in Creative Marketing.

- October 9, 2003—$2,000 in the Witherspoon affair.

- October 28, 2003—$50,000 in the Witherspoon affair.

Schlichte's total investment in the Yournet related entities and the Witherspoon affair was $875,000.00. *Id.* ¶ 63.

The Complaint also contends that Cleveringa and Anderson caused the following "lulling payments" to be made to the plaintiffs for the purpose of enticing them to make further investments:

- November 17, 2000—Schuster received $25,000.

- October 2, 2001—Schuster received $4,000.

- December 17, 2001—Schuster received $25,000.

- August 26, 2002—Schlichte received $100,000 plus $5,515.83 in interest.

The plaintiffs contend that the August 26, 2002, payment to Schlichte was from the proceeds of a loan Cleveringa induced Schuster to incur at ASB.

The plaintiffs further allege that, without Schuster's authorization, Cleveringa

and/or Anderson told other potential investors in the Yournet related entities and the Witherspoon affair, including Schlichte, that Schuster would guarantee their investments. *See* Complaint at ¶ 67. Schuster did not authorize any such guarantees offered by the defendants, and was unaware that such guarantees were being given. Further, many of the loans procurred by Schuster through ASB were distributed for purposes, and in ways, unauthorized by Schuster. *Id.* ¶ 68. Finally, the Complaint asserts that Cleveringa and Anderson, to facilitate their conspiracy to defraud the plaintiffs, routinely wired funds obtained from Schuster and Schlichte through financial institutions, including ASB, in violation of 18 U.S.C. § 1343. *Id.* ¶ 69.

## II. LEGAL ANALYSIS

### A. Rule 12(b)(6) Standards

The issue on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence in support of his, her, or its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir. 1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999) ("On a motion to dismiss, we review the district court's decision de novo, accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant]."); *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen*, 168

F.3d 1109, 1113 (8th Cir. 1999) (same); *Midwestern Machinery, Inc. v. Northwest Airlines*, 167 F.3d 439, 441 (8th Cir. 1999) (same); *Wisdom v. First Midwest Bank*, 167 F.3d 402, 405 (8th Cir. 1999) (same); *Duffy v. Landberg*, 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied*, 525 U.S. 821 (1998); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303-04 (8th Cir. 1997) (same); *WMX Techs., Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir. 1997) (same); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir. 1996) (same).

The court is mindful that, in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (citing *In re Syntex Corp. Securities Lit.*, 95 F.3d 922, 926 (9th Cir. 1996)); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987), and 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357, at 595-97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1103 (6th Cir. 1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan*, 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the plaintiffs' complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting

16

*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984));

*accord Conley,* 355 U.S. at 45-46 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Meyer*, 178 F.3d at 519 ("The question before the district court, and this court on appeal, is whether the plaintiff can prove any set of facts which would entitle the plaintiff to relief" and "[t]he complaint should be dismissed 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations,'" quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)); *Gordon*, 168 F.3d at 1113 ("We will not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief."); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998) (same); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (same); *Doe*, 107 F.3d at 1304 (same); *WMX Techs., Inc.*, 105 F.3d at 1198 (same). Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

In this instance the plaintiffs' claims are generally for professional negligence, breach of fiduciary duty, fraudulent misrepresentation, fraudulent nondisclosure, negligent misrepresentation, fraud in the inducement based on fraudulent misrepresentations, fraud

in the inducement based on fraudulent nondisclosures, negligent supervision, and breach of contract, and RICO violations under 18 U.S.C. §§ 1962(b), (c) & (d). This court's subject matter jurisdiction is grounded in federal question jurisdiction based upon the plaintiffs' RICO claims in Counts XIV - XVI, with supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims. The defendants assert, and the plaintiffs concede, that dismissal of Counts XIV-XVI would divest this court of federal jurisdiction. Therefore, the court will begin its analysis of the defendants' motions to dismiss with the RICO claims.

## B.  Civil RICO Claims—Counts XIV-XVI

### 1.    The RICO claims generally

Schuster and Schlichte allege civil RICO[5] violations against Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Cleveringa and ASB under §§ 1962(b), 1962(c), and 1962(d), in Counts XIV, XV, and XVI, respectively. These sections provide:

> (b)     It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to

---

[5]For an in-depth discussion of the purpose and scope of RICO, refer to this court's decisions in *Reynolds v. Condon*, 908 F. Supp. 1494, 1506-07 (N.D. Iowa 1995) and *DeWit v. Firstar Corp.*, 879 F. Supp. 947, 960-62 (N.D. Iowa 1999).

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(b)-(d) (2005); *see H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232-33, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) ("RICO renders criminally and civilly liable 'any person' who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c), or, finally, who conspires to violate the first three subsections of 1962. § 1962(d)."). Common to Sections 1962(b)-(d) are the concepts of a "pattern of racketeering activity" and the existence of an "enterprise." *See, e.g., In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 767 (8th Cir. 2003) ("To state a claim under § 1962(c), a plaintiff must establish: (1) the existence of an enterprise; (2) conduct by the defendants in association with the enterprise; (3) the defendants' participation in at least two predicate acts of racketeering; and (4) conduct that constitutes a pattern of racketeering activity."); *Information Exchange Sys., Inc. v. First Bank Nat'l Ass'n*, 994 F.2d 478 (8th Cir. 1993) (affirming the trial court's dismissal of the § 1962(b) claim where the plaintiffs had failed "to demonstrate both the requisite predicate acts and the requisite relatedness of those acts.").

As all the defendants—with the exception of Carl Anderson and Anderson

Accounting & Tax Services, Inc., who are not named in the RICO Counts—assert the same basic arguments for dismissal of the RICO Counts, the court will speak of the defendants' proffered arguments in the aggregate, rather than separating the arguments out by defendant. In other words, the court will set forth the arguments for dismissal of the RICO Counts in general where the defendants are arguing the same theory for dismissal, and identify by defendant only those theories particular to any one defendant. In this subsection, the use of "defendants" refers only to those defendants against which Civil RICO claims are alleged in the Complaint—Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Cleveringa and ASB. The defendants allege three basic infirmities in the Complaint: (1) failure to plead fraud with the particularity required by Rule 9(b); (2) failure to adequately plead an enterprise; and (3) that ASB cannot be held liable for RICO violations under the theory of *respondeat superior*. The court will address each of these grounds in turn.

### 2. Pleading fraud with particularity

#### a. Arguments of the parties

The defendants first contend that the plaintiffs have not plead the predicate acts of fraud with the requisite particularity. The defendants assert that the specificity requirements of Federal Rule of Civil Procedure 9(b) apply to the Civil RICO claims, and that the plaintiffs have fallen woefully short of meeting that requirement. Specifically, the defendants point out the Complaint alleges "wire fraud" as the predicate act for the RICO claims, but does not identify the time, place, contents or speaker of any misrepresentations made to Schlichte and Schuster. The defendants additionally assert that the Complaint also fails to set forth specific facts that made it reasonable for the speaker to know that any statements to Schlichte or Schuster were materially false or misleading. The defendants argue that the assertion in the Complaint that Cleveringa and Anderson "induced" various

investments of money is conclusory and insufficient. The defendants further discount the footnote explaining the use of the term "induced" as "'a representation made by Cleveringa and/or Anderson that the proposed investment was a good investment, that was safe and would return a good profit'" as likewise conclusory. Defendant Amercian State Bank's Brief in Support of Its Renewed motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) ("ASB's Brief"), Doc. No. 55, at 6-7 (quoting Complaint at pg. 12 n.4).

The plaintiffs thoroughly resist the defendants' contentions that the predicate acts of fraud are not pled with the specificity required by Rule 9(b). Specifically, the plaintiffs point out that the date, time, place of origin, dollar amount, and recipient of the alleged wire frauds are set forth in paragraph 69 of the Complaint. The plaintiffs argue that it is difficult to identify the speaker of any misrepresentations as no discovery has been conducted in this case—however, the plaintiffs assert it is clear that the wires were initiated by someone authorized to direct such transfers and that appropriate paperwork had to be completed by employees for such transfers to have happened. The plaintiffs contend that the Complaint alleges that either Anderson or Cleveringa initiated each of these wire transfers. The plaintiffs recognize that the wire transfers, in and of themselves, do not indicate fraud—but that the actions giving rise to those wire transfers give rise to the wire fraud alleged in the Complaint. According to the plaintiffs, the Complaint clearly alleges "that Cleveringa and Anderson were involved in soliciting investors and/or loaning money to investors for the purpose of investing in fraudulent investments" in entities that were formed for the sole purpose of soliciting such fraudulent investments. Plaintiffs' Resistance and Brief in Support of Plaintiffs' Resistance to All Defendants' Motions to Dismiss ("Plf.s' Resistance"), Doc. No. 58, at 13. The plaintiffs assert that the Complaint identifies Cleveringa and Anderson as two individuals that "induced" them to make investments in these fraudulent schemes and entities by representing that they were good

investments that would result in a profit. Further, the plaintiffs contend that the Complaint specifically identifies such investments by Schuster on 37 occasions (26 from his own assets and 11 from loan proceeds) and by Schlichte on 22 occasions. Additionally, the plaintiffs claim the Complaint identifies the offices of ASB as one location that Anderson and Cleveringa made these fraudulent representations, and that Schuster contends that fraudulent misrepresentations were made to him at his office in LeMars, Iowa, at Anderson's office in Orange City, Iowa, and in Minnesota. The plaintiffs contend that the only fact which they cannot yet set forth without conducting discovery is which of Schuster's investments and Schlichte's investments were solicited at Schuster's office, Anderson's office, ASB or Minnesota. Finally, the plaintiffs contend that should the court find that additional facts must be plead to survive the motions to dismiss that the court give them leave to file a Third Amended and Substituted Complaint.

In reply, the defendants reiterate their original basis for dismissal of Counts XIV -XVI: (1) fraud has not been plead with the requisite particularity; (2) an enterprise has not been plead; and (3) ASB cannot be held liable under a *respondeat superior* theory of liability. As to pleading fraud with particularity, the defendants urge that the question is not whether the wire transfers themselves have been plead with particularity, but rather whether the "circumstances constituting fraud" have been plead with particularity. *See* Defendant American State Bank's Reply Brief In Support Of Its Renewed Motion To Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) ("ASB's Reply"), Doc. No. 66, at 1. The defendants aver that the plaintiffs, though conceding that the act of wiring money alone does not constitute fraud, wholly fail to allege the time, place, contents, and speaker of any fraudulent misrepresentations made to them or set forth specific facts that make it reasonable to believe that the speaker knew any statements made were false or misleading. The defendants point to Cleveringa as an example—according to the defendants, under a

reading of the Complaint, it is entirely possible that Cleveringa made *no* statements to the plaintiffs about their investments; which is unacceptable as the plaintiffs are relying on Cleveringa's status as an ASB employee to hold ASB liable in Civil RICO. The defendants also attack the plaintiffs' resistance to the extent that it only identifies locations where fraudulent misrepresentations were made—stating that as there are no allegations as to what was said at those meetings and that this fails to meet the plaintiffs' Rule 9(b) burden. The defendants rebuke the plaintiffs' contention that further discovery would be necessary to determine which investments were solicited at which locations—arguing that if the plaintiffs "actually invested in reliance on misrepresentations that were made to them, they should be able to allege the required Rule 9(b) requirements regarding those misrepresentations without discovery." ASB's reply at 3. Finally, ASB contends that allowing the plaintiffs a third attempt to plead fraud with the particularity required by Rule 9(b) would be futile as the only facts the plaintiffs contend they do not yet possess (i.e. which investments were solicited at which locations) would not cure the Rule 9(b) deficiencies.

### b. *The law*

Courts have held that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)[6] apply to allegations of fraud in a civil RICO complaint. *See, e.g., Murr Plumbing, Inc. v. Scherer Bros. Fin.* , 48 F.3d 1066, 1069 (8th Cir. 1995) (applying Rule 9(b) to allegations of mail and wire fraud as predicate acts for RICO claims); *Gunderson v. ADM Investor Servs., Inc.*, 85 F. Supp. 2d 892, 914 (N.D. Iowa 2000) (noting that

---

[6]Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." FED. R. CIV. P. 9(b) (2005).

Rule 9(b) requirements of heightened pleading apply to civil RICO claims alleging fraud-based predicate acts). This court has articulated the standards for pleading fraud with the particularity required by Rule 9(b) in several decisions. *See Iowa Health Sys. v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 916 (N.D. Iowa 2001); *Wright v. Brooke Group, Ltd.*, 114 F. Supp. 2d 797, 832-33 (N.D. Iowa 2000); *Gunderson*, 85 F. Supp. 2d at 903; *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1055 (N.D. Iowa 1999); *North Central F.S., Inc. v. Brown*, 951 F. Supp. 1383 (N.D. Iowa 1996). In *Wright*, this court provided the following brief discussion of the Rule 9(b) requirements:

> Rule 9(b) of the Federal Rules of Civil Procedure "'requires a plaintiff to allege with particularity the facts constituting the fraud.'" *See Brown*, 987 F. Supp. at 1155 (quoting *Independent Business Forms v. A-M Graphics*, 127 F.3d 698, 703 n.2 (8th Cir. 1997)). "'When pleading fraud, a plaintiff cannot simply make conclusory allegations.'" *Id.* (quoting *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997)). In *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, (8th Cir. 1995), the Eighth Circuit Court of Appeals explained:
>
>> Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstance constituting fraud or mistake shall be stated with particularity." "'Circumstances' include such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S. Ct. 527, 78 L. Ed. 2d 710 (1983). Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, *Greenwood v. Dittmer*, 776

> F.2d 785, 789 (8th Cir. 1985), conclusory
> allegations that a defendant's conduct was
> fraudulent and deceptive are not sufficient to
> satisfy the rule. *In re Flight Transp. Cor. Sec.
> Litig.*, 593 F. Supp. 612, 620 (D. Minn. 1984).
> *Commercial Property*, 61 F.3d at 644; *see Roberts*, 128 F.3d
> at 651 (noting that factors a court should examine in
> determined whether the 'circumstances' constituting fraud are
> stated with particularity under Rule 9(b) "include the time,
> place and contents of the alleged fraud; the identity of the
> person allegedly committing fraud; and what was given up or
> obtained by the alleged fraud.").

*Wright*, 114 F. Supp. 2d at 832-33. In sum, the "complaint must be specific with respect to the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identity of the parties to those misrepresentations." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999).

At the heart of any RICO claim is conduct involving a "pattern" of racketeering activity. 18 U.S.C. § 1962; "Racketeering activity"—as referred to in Sections 1962(b)-(d)—is defined by the RICO statutes to include a number of indictable offenses. *See* 18 U.S.C. § 1961(1); *Manion v. Freund*, 967 F.2d 1183, 1185 (8th Cir. 1992). RICO defines a "pattern" as requiring at least two acts of racketeering or predicate acts. 18 U.S.C. § 1961(5). Section 1961 lists these racketeering activities—which include specific federal and state law crimes. *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 768 (8th Cir. 1992). One such predicate act, and the predicate act alleged by the plaintiffs in the Complaint as establishing a "pattern of racketeering," is wire fraud. *See id.* In *Abels v. Farmers Commodities Corporation*, 259 F.3d 910 (8th Cir. 2001), the Eighth Circuit Court of Appeals discussed, generally, the pleading requirements for wire or mail fraud as

predicate acts for a RICO claim:

> In order . . . to survive dismissal, however, the plaintiffs must also have adequately pleaded a "pattern of racketeering activity." 18 U.S.C. § 1962(c). In this case, RICO liability is predicated on alleged acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. Those offenses consist in the foreseeable use of the mails or wires for the purpose of carrying out a scheme to defraud. *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 991 (8th Cir. 1989). Beyond that, the offense conduct may vary rather widely. "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Id.* A plaintiff may, but need not, allege that a defendant made misrepresentations of fact. *Murr Plumbing, Inc. v. Scherrer Brothers Financial*, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995). Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense. *See, e.g.*, *Atlas Pile Driving*, 886 F.2d at 992 ("a mailing [that serves as an element of mail fraud] may be a routine mailing or even one that is sent for a legitimate business purpose so long as it assists in carrying out the fraud.").

*Abels*, 259 F.3d at 918. Further, mail and wire fraud are established by showing the following four elements: (1) a scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mails or wires would be used; and (4) use of the mails or wires in furtherance of the scheme. *United Healthcare Corp. v. American Trade Ins. Co., Ltd.*, 88 F.3d 563, 571 (8th Cir. 1996) (quoting *Murr Plumbing*, 48 F.3d at 1069 n.6); *see also Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, (8th Cir. 1999) (citing *Murr Plumbing*, and noting the four factors that must be established where mail or wire

fraud is plead as a predicate act). *Manion*, 967 F.2d at 1186 (noting that "[m]ail or wire fraud requires proof of a scheme to defraud and use of the mails or wires in furtherance of that scheme."). A showing of an intent to defraud is critical to establishment of the predicate acts of wire fraud:

> No single fact need demonstrate the defendant's intent; rather, intent to defraud can be discerned by examining the totality of the circumstances surrounding the defendant's activities. [*Atlas Pile Driving*, 886 F.2d at 991.] Intent to defraud need not be evidenced by the defendant's avowed intent to bilk members of the public; it can also be demonstrated when the defendant recklessly disregards whether his representations are true. *E.g. United States v. Henderson*, 446 F.2d 960, 966 (8th Cir.), *cert. denied*, 404 U.S. 991, 92 S. Ct. 536, 30 L. Ed. 2d 543 (1971).

*Diamonds Plus, Inc.*, 960 F.2d at 768.

### c.    *The Complaint*

Count XIV, in which Schuster and Schlichte assert a § 1962(b) claim against the defendants, provides, in relevant part:

> 169. [Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Cleveringa, ASB (hereinafter in Count XIV referred to as "these defendants")] committed at least two predicate acts of wire fraud. Fourteen specific wire transfers are identified in paragraph 69 *supra*. The funds transferred in these wire transfers came from either the loans that Schuster took out as described in paragraph 57 *supra*, or the investments made by Schuster as described in paragraph 62 *supra*, or the loans, line of credit or investments made by Schlichte as described in paragraphs 63 and 64 *supra*. The wire transfers were made to further the purposes set forth in paragraphs 38 through 48, 53 through 56, and 58, *supra*.
>
> 170.    Each of these wire transfers were either authorized or directed by Anderson or Cleveringa. Anderson's

authorizations and/or directions were given on his behalf and the behalf of F. H. Anderson Company, P.C. and/or F. H. Anderson Company. Cleveringa's authorizations and/or directions were given on his behalf and on behalf of ASB.

171. Each of these authorizations and/or directions was given over the telephone (additional examples of wire fraud) or in person at one of three primary locations: Schuster's primary business office in Le Mars, Iowa, or at ASB in Sioux Center, Iowa, or at Anderson's primary place of business in Orange City, Iowa.

Complaint at ¶¶ 169-171.

### d.    Analysis

It appears as though two issues have actually been raised by the defendant's motion to dismiss: (1) whether the predicate acts are plead with sufficient particularity; and (2) whether the circumstances constituting fraud have been plead with sufficient particularity. The court will address each of these contentions in turn.

*i*    *Wire transfers*.  The court first turns to whether the allegations of wire fraud are plead with the particularity required by Rule 9(b).    In terms of the wire transfers themselves, the court keeps in mind that "[b]ecause misrepresentations of fact are not necessary to [mail or wire fraud], it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense." *Abels*, 259 F.3d at 918.  Counts XV and XVI, which plead § 1962(c) and (d) RICO claims, respectively, incorporate this language by reference insofar as describing the predicate acts of wire fraud and the scheme to defraud. Complaint at ¶¶ 178, 181.  Paragraph 69 of the Complaint, that claimed to identify the wire transfers, reads as follows:

69.  Throughout the conspiracy to defraud Schuster, Schlichte and other investors, Cleveringa and Anderson

routinely wired funds through, among other financial institutions, ASB, in perpetrating fraud on Schuster, Schlichte and other investors in violation of 18 U.S.C. § 1343. Plaintiffs have been able to identify the following representative wire transfers at this early stage:

a. On or about November 8, 2000 the sum of $52,658.63 from the Yournet account at ASB to the personal account of Chuck Hinnenkamp at First Star, Minnetonka, Minnesota. These funds originated from Schuster loan proceeds. At no time did Schuster agree to borrow money to be given to Hinnenkamp.

b. On or about March 14, 2002 the sum of $10,015 from the Yournet account maintained at defendant, ASB to Chuck Hinnenkamp. These funds originated from Schuster loan proceeds. At no time did Schuster agree to borrow money to be given to Hinnenkamp.

c. On or about January 31, 2002, the sum of $7638.58 from an account maintained at Iowa State Bank by Anderson to Robert Unfress. These funds originated from Schuster loan proceeds.

d. On or about January 31, 2002, the sum of $2,487.71 from an account maintained at Iowa State Bank by Anderson to Park Inn Suites. These funds originated from Schuster loan proceeds.

e. On or about January 31, 2002, the sum of $10,014 from an account maintained at Iowa State Bank by Anderson to Anthony Pollasky. These funds originated from Schuster loan proceeds.

f. On or about January 31, 2002, the sum of $36, 564.67 from an account maintained at Iowa State Bank by defendant Fay Anderson to Chuck Hinnenkamp. These funds originated from Schuster loan proceeds.

g. On or about October 29, 2002 the sum of $50,015 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon affair.

h. On or about November 15, 2002 the sum of

$300,015 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon affair.

      i.  On or about January 30, 2003 the sum of $160,015 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon affair. These funds originated from Schlichte loan proceeds.

      j.  On or about March 17, 2003 the sum of $130,000 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon affair. These funds originated, in part, from Schlichte loan proceeds.

      k.  On or about October 8, 2002 the sum of $30,000 from ASB to Russ Barber in connection with the Witherspoon affair.

      l.  On or about August 27, 2002 the sum of $360,015 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon affair.

      m.  On or about October 25, 2005 the sum of $100,000 from the R-Chief account maintained at ASB to Wachovia Bank in Charlotte, North Carolina in connection with the Witherspoon Affair. These funds originated from Schuster loan proceeds.

      n.  On or about October 28, 2002 the sum of $50,000 from ASB to Russ Barber in connection with the Witherspoon affair. These funds originated from Schuster loan proceeds.

Complaint at ¶ 69. Finally, Count XIV, and Counts XV and XVI by reference, indicates that the wire transfers were made for the purposes set forth in paragraphs 38 through 48, 53 through 56, and 58—which provide:

      38.    On information and belief, Cleveringa and Anderson, and other known and unknown individuals, to include Chuck Hinnenkamp, created a number of legal entities,

described in this section, for the purposes of establishing vehicles to be used to solicit investors in various fraudulent investment schemes. It is unclear whether the individuals who formed these entities intended from the start to defraud various investors or whether this intent formed at a later date.

39. At some point, the individuals who formed and/or operated the various legal entities described in this section, conspired to defraud investors in general, and Schuster and Schlichte specifically, in what amounted to a series of fraudulent investment schemes.

40. The investment schemes were fraudulent because these individuals, in general, and Cleveringa and Anderson, in particular, intended to defraud Schuster and Schlichte of their savings and other assets through investment schemes that had no possibility of coming to fruition since the "investments" were not investments but simply transfers of cash to Anderson and others. Some of the investors' money was spent on normal business expenses in order to present the appearance to investors that those were legitimate businesses.

41. Plaintiffs' "investments" were funded either from cash from Schuster or Schlichte's assets or by the proceeds of loans made to Schuster or Schlichte by ASB and other financial institutions.

42. On or about March 24, 1997, Creative Marketing & Communications Inc. (hereinafter "Creative Marketing") was formed. Cleveringa was an officer, director and shareholder in Creative Marketing. Anderson also held an ownership interest in Creative Marketing.

43. On information and belief, Creative Marketing was established for the purpose of providing a vehicle in which to solicit investors in what amounted to a series of fraudulent investment schemes. In their efforts to solicit investors/victims for Creative Marketing, Cleveringa and Anderson arranged investment meetings that were held at ASB in Sioux Center, Iowa.

44. On information and belief, Team Ink, L.L.C. (hereinafter "Team Ink") was another entity and/or utilized as

part of a conspiracy to defraud investors. Team Ink was combined with Creative Marketing in late 1998.

45. On information and belief, in or about 1998, an entity known as World Wide Future Net, a/k/a WWFN (hereinafter "WWFN"), was created and/or utilized as part of a conspiracy to defraud investors. Anderson had a financial interest in WWFN.

46. On or about October 1, 1998, an entity by name of Yournet was created and/or utilized as part of a conspiracy to defraud investors. Shortly after the formation of Yournet, the alleged "net assets" of WWFN were transferred to Yournet in exchange for the issuance of stock in Yournet to Anderson and another individual who played a prominent role in the Yournet related entities, Chuck Hinnenkamp.

47. On or about November 7, 2000, an entity by name of Quan Capital Corporation was created and/or utilized as part of a conspiracy to defraud investors.

48. On information and belief, at least two additional entities, R-Chief and Zaba Industries were also created and/or utilized as part of a conspiracy to defraud investors.

* * *

53. During September of 2002, in a meeting held at ASB, Cleveringa and Anderson presented an investment opporunity to Schuster and Schlichte related to an "investment" in an alleged jury verdict of over $600 million awarded to Darryl Witherspoon. The purpose of the alleged investment was to cover future expenses related to the lawsuit, with a promised return between 500% and 1,000%.

54. At the time Cleveringa, Anderson and ASB recommended the Witherspoon investment to Schuster and Schlichte, they all knew or should have known but for a reckless disregard of the facts, that the investment opportunity was a fraud.

55. At all times material to Schuster's and Schlichte's "investments" in the Witherspoon fraud, Cleveringa and Anderson had a financial interest therein, by virtue of a series of promissory notes made payable to Creative Marketing,

which were allegedly executed by Darrell Witherspoon and/or Russ Barber, two individuals who were criminally involved in the Witherspoon affair.

    56. For all intents and purposes, the Witherspoon affair was simply a continuation of the same fraudulent activity conducted by the same known entities, Cleveringa, Anderson, ASB, and other unknown entities, in the criminal enterprise identified as an "association in fact" in note 4, *supra*. In other words, while the object of the investment had changed, the players for the most part remained the same and the funding mechanisms also remained the same: an infusion of cash by Schuster, Schlichte or the proceeds of Schuster loans from ASB and other financial institutions.

* * *

    58. Cleveringa and Anderson induced Schuster to borrow the money set forth in paragraph 57 *supra*, for the purposes of investing in Yournet, Yournet related entities or the Witherspoon affair. Additionally, some of the money that Schuster borrowed was used to pay off earlier investment loans that were due and owing. The proceeds of such loans were deposited into Yournet and/or Yournet related entities' accounts at ASB, and then disbursed to various individuals and entities. ASB derived a substantial benefit by virtue of Schuster's interest payments on these loans and also by the fact that some of the money Schuster borrowed was used by ASB to pay off notes owed to the bank by less credit-worthy customers. Anderson and Cleveringa were among the recipients of money disbursed from Schuster loan proceeds.

Complaint at ¶¶ 38-48, 53-56, 58 (footnote omitted). The term "induced" used in paragraph 58 is further defined in a footnote as: "a representation made by Cleveringa and/or Anderson that the proposed investment was a good investment, that it was safe and would return a good profit on Schuster's investment." Complaint at pg. 12 n.4.

In this instance, the plaintiffs, in paragraph 69, have set forth the time, amount, and parties to fourteen wire transfers that they allege comprise the predicate racketeering acts and in

paragraphs 38-48, 53-56, and 58, have set forth the purposes and/or motivations behind the wire transfers. The plaintiffs have also asserted that these wire transfers originated in one of three discrete locations—"Schuster's primary business office in Le Mars, Iowa, or at ASB in Sioux Center, Iowa, or at Anderson's primary place of business in Orange City, Iowa." Complaint at ¶ 171. The allegations as to the wire transfers themselves, which set forth dates, amounts, the entities the funds were transferred between via wires, and a discrete number of locations from which the wire transfers originated, meet the pleading requirements of Rule 9(b).

      *ii.    Circumstance constituting fraud.* Now, the court turns to the defendants' contention that the "circumstances constituting" a scheme to defraud by the defendants are not plead with sufficient particularity—most specifically, that the locations and content of any misrepresentations by the defendants is notably absent from the Complaint. FED. R. CIV. P. 9(b). From the Complaint, it is clear that the plaintiffs allege that Anderson, Cleveringa, and unknown individuals formed a series of business entities in which they held an interest—including: Creative Marketing, Team Ink, WWFN, Yournet, Quan Capital Corporation, R-Chief and Zaba—for the purposes of inducing Schlichte and Schuster to invest in these entities, and once such investments were made Cleveringa and Anderson would extract the funds from those entities and put them to their own personal use. The Complaint also alleges that ASB maintained accounts for several of these 'shell' entities, including Yournet, WWFN and R-Chief—accounts for which Cleveringa was the responsible ASB officer. *See* Complaint at ¶ 49. There are additional allegations that the defendants induced Schuster to take out loans from ASB, and put up certain personal and business property as collateral, such that he could invest in these business entities, and that the defendants also induced Schlichte to borrow money from, or take out lines of credit with, ASB for the same purpose. The Complaint also states that "[i]n their efforts to

solicit investors/victims for Creating Marketing, Cleveringa and Anderson arranged investment meetings that were held at ASB in Sioux Center, Iowa." *Id.* ¶ 43. With regard to the Witherspoon affair, the plaintiffs contend that Cleveringa and Anderson presented the "investment" opportunity to Schlichte and Schuster at ASB during September 2002 and that Cleveringa and Anderson "induced Schuster to borrow money" from ASB "for the purposes of investing in Yournet, Yournet related entities or the Witherspoon affair" and to "pay off earlier investment loans that were due and owing." *Id.* ¶¶ 53, 58.

As previously noted, to specifically allege the "circumstances constituting fraud" the plaintiffs must set forth "'the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *Abels*, 259 F.3d at 920 (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S. Ct. 527, 78 L. Ed. 2d 710 (1983)). In addition to the details set forth above, the Complaint also contains two additional paragraphs relating to Schuster and Schlichte's investments in the Yournet related entities and the Witherspoon affair. With respect to Schuster the Complaint provides:

> Between approximately October 10, 1997 and early 2004, Cleveringa and Anderson induced Schuster to make "investments" totaling $1,748,873.80 in Yournet, Yournet related entities or the Witherspoon affair, as more fully set forth below. These investments were funded by Schuster's personal assets and/or loans made to Schuster by other financial entities. The proceeds of these investments were deposited into various accounts and then distributed to various individuals and entities. Cleveringa and Anderson derived a substantial benefit by virtue of the following Schuster investments in that some of the money was paid directly to Cleveringa and/or Anderson, as well as the fact that they had financial interests in the entities Schuster was being induced to

> invest in. . . .

Complaint at ¶ 62. (footnotes omitted). Immediately following that paragraph, the Complaint lists a non-exclusive list of 26 different investments with details as to the date, the amount invested, and the entity invested in of each investment. *Id.* ¶ 62(a)-(z). Immediately following is a similar paragraph stating the same allegations, only substituting in Schlichte's name for Schuster, and replacing the dollar amount of the total investment with $847,500. *Id.* ¶ 63. The paragraph relating to Schlichte includes a non-exclusive list of 21 different investments, and, with regard to each, sets forth the investment date, who induced the investment, the amount of the investment, and the entity invested in. *Id.* ¶ 63(a)-(u). The defendants claim that the plaintiffs' use of the verb "induced," is insufficient to state fraud with particularity—even when coupled with the footnote in the Complaint defining the word as "a representation made by Cleveringa and/or Anderson that the proposed investment was a good investment, that it was safe and would return a good profit on Schuster's investment." Complaint at pg. 12 n.4. Reading the definition given to "induce"—that Cleveringa and/or Anderson represented that the investment was essentially a viable, non-fraudulent, investment opportunity—in conjunction with paragraph 58 describing Cleveringa and Anderson's inducement of Schuster to take out loans from ASB for purposes of investing, paragraphs 62 and 63 describing Cleveringa and/or Anderson's inducement of specific investments on specific dates from Schuster and Schlichte and paragraph 64 describing Cleveringa and ASB's inducement of Schlichte to borrow money from, or take out lines of credit at, ASB to make further investments provides the following, particular information as to each investment and/or loan: which plaintiff made the investment, investment dates, investment amounts, whether the investment originated from loan proceeds of Schlichte or Schuster, the entity invested in, and that either Cleveringa, Anderson or both "induced" the investment by claiming *that*

*specific investment* was a safe, nonfraudulent investment. Thus, the Complaint sets forth the representation that *the particular investment* was nonfraudulent and viable; that the allegedly fraudulent representation as to the particular investment was made by Cleveringa, Anderson, or both; the date of the investment; the amount invested; whether the investment came from loans or lines of credit Schuster or Schlichte were induced to make with ASB,;which plaintiff made each investment; and the entity the investment was intended to be made in.

As to the location of the representations, the Complaint alleges that investment meetings specifically regarding investments in Creative Marketing—a Yournet entity—and the Witherspoon affair were held at ASB in Sioux Center, Iowa, Complaint at ¶¶ 43, 53, and that the authorizations for the wire transfers were given either at ASB, at Schuster's primary business office in Le Mars, Iowa, or at Anderson's primary place of business in Orange City, Iowa. *Id.* ¶ 171. Additionally, the Complaint states generally that Cleveringa held meetings at ASB for the purpose of encouraging investment in the Yournet related entities in general. *Id.* ¶ 22. The plaintiffs, in their resistance, indicate that the representations inducing the investments set forth in paragraphs 62 and 63, and the inducement of loans in paragraphs 58 and 64, were made at Schuster's office in Le Mars, Iowa, Anderson's office in Orange City, Iowa, and at a meeting in Minnesota. Plf.s' Resistance at 14. Though the Complaint *could* have been clearer as to the precise locations of the representations, the court finds that the slight murkiness in this area is not fatal in light of the specificity in which the other aspects of fraud are plead—i.e. time, representation, speaker, investment amount, investment entity, and loan amounts. After all, "one of the main purposes of [Rule 9(b)] is to facilitate the defendant's ability to respond and prepare a defense to charges of fraud," *Commerical Property*, 61 F.3d at 644, and the Complaint surely puts the defendants on notice that the plaintiffs are alleging fraud

based on the defendants' representations to Schuster and Schlichte to invest in Yournet, the Yournet related entities and the Witherspoon affair, where an investment by Schuster or Schlichte resulted from those representations, and where the investment was derived from personal funds or loan proceeds/lines of credit obtained from ASB—as detailed in paragraphs 58, 62, 63 and 64. Further, the locations of these representations as to the specific investments and loans detailed in the Complaint—viewing the allegations of the Complaint as true—are no mystery to the defendants as they, and they alone, had an integral role in procuring the specific loans and investments. As such, the court finds that the Complaint sufficiently pleads the circumstances constituting fraud with the particularity required by Rule 9(b). The defendants' motions to dismiss in this regard are **denied**.

### 3. Pleading the "enterprise" requirement

#### a. Arguments of the parties

As their second ground for dismissal, the defendants contend that civil RICO claims require illegal activity to have been conducted through an "enterprise" and that the "enterprise" can be an "association in fact" so long as it has a "distinct structure" separate and apart from a pattern of racketeering activity. The defendants note that in the Complaint the plaintiffs assert : "The entities and individuals, including the Defendants, constituted an enterprise consisting of an 'association in fact.'" Complaint at pg. 7 n.2. The defendants argue that this is "merely a boilerplate legal conclusion . . . that all the defendants and all other individuals and entities constituted an enterprise." ASB's Brief at 8. As such, the defendants argue that the RICO Counts should be dismissed as the plaintiffs have failed to allege facts supporting the existence of an "enterprise" separate and distinct from the alleged racketeering activity.

The plaintiffs resist the defendants' assertion that the "enterprise" element was not adequately plead in the Complaint. The plaintiffs agree that the law imposes a requirement

that an "enterprise" separate and distinct from a pattern of racketeering activity must be alleged in order to sustain a civil RICO claim.  But, to the plaintiffs, the Complaint "makes it clear that the enterprise being alleged is an 'association in fact' consisting of Anderson, Cleveringa, ASB, Yournet, Creative Marketing, Team Ink, L.L.C., WWFN, Quan Capital Corporation, R-Chief and Zaba Industries." Plf.s' Resistance at 15.  The plaintiffs assert that at this time, prior to any discovery taking place and without running afoul of Federal Rule of Civil Procedure 11(b)(3), the best they can do is allege facts that they believe are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.  Under this light, the plaintiffs contend that the evidence will likely show the following common links, outside of the fraudulent activity alleged in the complaint, between the RICO claim defendants:  Anderson and ASB had a symbiotic arrangement of referring business to each other—with some of the referrals legitimate, and others fraudulent in nature; Anderson and Cleveringa had a long-standing business referral relationship outside of the fraudulent activities alleged in the Complaint; and Cleveringa was, and still is, the vice-president of ASB, and many of his contacts with Anderson were in his capacity as an ASB employee.  Further, the plaintiffs argue that even if Cleveringa, Anderson and ASB did not have other contacts with other individuals and entities identified in the Complaint, Cleveringa, Anderson and ASB alone could constitute an association-in-fact sufficient to meet the "enterprise" requirement.

In reply, the defendants reiterate that the plaintiffs have failed to properly plead the enterprise requirement—despite the fact that the plaintiffs recognize that the law requires them to plead "an ascertainable structure distinct from the pattern of racketeering," the Complaint wholly fails to do so. ASB's Reply at 4 (quoting Plf.s' Resistance at 15).  Specifically, the Complaint's bare legal conclusion that the defendants constitute an "association in fact" and speculation of a long standing business referral relationship

between Anderson, Cleveringa and ASB, does not suffice to sufficiently allege an association in fact. The defendants aver that even if all speculation stemming from the pleadings was resolved in the plaintiffs favor, the Complaint as it stands would still not support the enterprise alleged in the Complaint—consisting of Cleveringa, ASB, Anderson, the F.H. Anderson Company, P.C., and F.H. Anderson Company. In summary, the defendants contend the plaintiffs can only speculate as to the existence of an enterprise separate from the alleged racketeering activity, and as this is woefully inadequate, the RICO claims should be dismissed.

### b. The law

The Eighth Circuit Court of Appeals has stated the following with regard to determination of whether an "enterprise" cognizable under RICO exists:

> Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise must be distinct from the person named as the RICO defendant. *See Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989). Moreover, the enterprise must be distinct from the alleged pattern of racketeering activity. *Id.* In other words, as the Supreme Court explained in *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528-29, 69 L. Ed. 2d 246 (1981), an enterprise is not established merely by proof of a series of racketeering acts. Instead, an enterprise must exhibit three characteristics: "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Atlas Pile*, 886 F.2d at 995.

*United HealthCare Corp.*, 88 F.3d at 570; *see also United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004) (noting that three elements must be proven to show that a RICO enterprise existed: "(1) a common purpose that animates the individuals associated with

it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering.") (citing *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir. 1987)); *U.S. v. Kehoe*, 310 F.3d 579, 586 (8th Cir. 2002) (discussing how a RICO enterprise is distinguishable from "individuals who associate [to commit] sporadic crime.") (citing *Kragness*, 830 F.2d 842, 855 (8th Cir. 1987)); *U.S. v. Keltner*, 147 F.3d 662, 668 (8th Cir. 1998) (citing elements of a cognizable RICO enterprise).

> The first characteristic, common or shared purpose, has apparently troubled the courts little, while the second, continuity of structure and personnel, has been of less certain meaning. *DeWit*, 879 F. Supp. at 966. The Eighth Circuit Court of Appeals has held that "continuity" does not require that members remain consistent. *Nabors*, 45 F.3d at 241. "Indeed, this circuit's definition of an enterprise specifically includes the phrase 'some continuity . . . of personnel,' *Atlas Pile Driving Co.*, 886 F.2d at 995, not 'complete continuity.'" *Id.* The third characteristic, distinct structure, has required the most clarification. *DeWit*, 879 F. Supp. at 967. The Eighth Circuit Court of Appeals has defined this characteristic as follows:
>
>> Th[e] distinct structure might be demonstrated by proof that a group has engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes [. . . .] Thus, the "focus of the inquiry" on this characteristic is "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." [*Diamonds Plus, Inc.*, 960 F.2d at 770].

*Gunderson*, 85 F. Supp. 2d at 916 (quoting *Reynolds v. Condon*, 908 F. Supp. 1494, 1509 (N.D. Iowa 1995)).

Where the alleged enterprise is an "association in fact," this court has previously noted:

> The Eighth Circuit Court of Appeals has noted that "[a]n enterprise is particularly likely to be found where . . . the enterprise alleged is a legal entity rather than an 'associational enterprise.' Legal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts." *Bennett*, 685 F.2d at 1060 (citing case). However where an association-in-fact entity is alleged, the Supreme Court has said that the enterprise may be shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 1010 S. Ct. at 2528; *Libertad*, 53 F.3d at 442 (describing the requirement as alleging facts that the constituent entities or persons constituted and operated as part of an association-in-fact enterprise); *Crowe*, 43 F.3d at 205 (citing this standard from *Turkette*); *Aetna Cas. & Surety*, 43 F.3d at 1557 (citing the *Turkette* standard); *Console*, 13 F.3d at 651-52 (citing *Turkette*); *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (citing *Turkette*). In other words,
>
>> [plaintiffs] must show the existence of the enterprise, of which [defendants] were a part. As a matter of law, it is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations, and that this unit meets the *Turkette* criteria for an "association-in-fact."
>
> *Libertad*, 53 F.3d at 442.

*De Wit v. Firstar Corp.*, 904 F. Supp. 1476, 1517 (N.D. Iowa 1995).

### c.    The Complaint

With regard to the "enterprise" requirement, the Complaint contains footnote 2,

which reads, in pertinent part: "The entities and individuals, including the Defendants, constituted an enterprise consisting of an 'association in fact.'" Complaint at pg 7 n.2. The language "[t]he entities and individuals" refers to the following: Chuck Hinnenkamp, Creative Marketing, Team Ink, WWFN, Yournet, Quan Capital Corporation, R-Chief and Zaba. With regard to the Witherspoon affair, the Complaint states: " For all intents and purposes, the Witherspoon affair was simply a continuation of the same fraudulent activity conducted by the same known entities, Cleveringa, Anderson, ASB, and other unknown entities, in the criminal enterprise identified as an "association in fact" in note 4 (sic), *supra.*" Complaint at ¶ 56.

### d.   *Analysis*

Upon reviewing the Complaint, the court agrees with the defendants that the conclusory statements that certain entities and individuals "constituted an enterprise of an 'association in fact'" is not sufficient to plead an "enterprise" distinct from the "persons" and/or pattern of racketeering activity as required by RICO. As noted above, for an "enterprise" to exist, particularly when the "enterprise" is not itself a legal entity but an association in fact, three elements must be satisfied. First, there must be a common or shared purpose. As to this prong, the Complaint does allege that a series of entities—*some of which* were formed by Anderson and Cleveringa, and others formed by unknown individuals—were created "for the purpose of establishing vehicles to be used to solicit investors in various fraudulent investment schemes." Complaint at ¶ 38. The Complaint also asserts that Cleveringa, Anderson and ASB acted in concert to defraud investors and to make investment recommendations in entities in which they had a financial interest. *Id.* ¶¶ 3940, 62-63. Though the Complaint is sparse in this regard, the Complaint does adequately assert that a mixture of individuals (Anderson and Cleveringa) and entities joined together for the purpose of engaging in a common course of conduct.

The second consideration requires "some continuity of personnel or structure." *Atlas Pile*, 886 F.2d at 995. "Continuity" does not require that the members of the enterprise remain consistent throughout the pattern of racketeering, but rather contemplates some fluidity among the members of the "enterprise"—hence the requirement of "*some* continuity,*" and not complete continuity. *Id.*; *see Gunderson*, 85 F. Supp. 2d at 916; *Condon*, 908 F. Supp. at 1509. Here, the plaintiffs contend that the defendants—Cleveringa, ASB, Anderson, F.H. Anderson Company, P.C., and F.H. Anderson Company—associated with various individuals, entities created by Anderson and Cleveringa, and entities created by unknown persons, to form the "enterprise" in this instance. The law does allow fluidity among the enterprise members, and a combination of individuals and business entities can come together to operate as an association in fact, and still satisfy the continuity element. *See Davies v. Genesis Med. Ctr Anesthesia & Analgesia, P.C.*, 994 F. Supp. 1078, 1088 (S.D. Iowa 1998) ("an enterprise may be an association in fact, i.e., *more than one entity or individuals* that are associated although not a legal entity.") (emphasis added) (citing 18 U.S.C. § 1961(4) and *U.S. v. Davidson*, 122 F.3d 531, 534 (8th Cir. 1997)); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 897 (8th Cir. 1999) ("An association of business entities . . . may serve as an 'enterprise.'"); *accord* Eighth Circuit Model Criminal Jury Instruction § 6.18.1962D at 440 (2003) ("Such an association of individuals may retain is status as an enterprise even though the association changes by adding or losing individuals during the course of its existence."). Hence, the court finds the Complaint sufficiently alleges some continuity of structure or personnel when it asserts an association in fact amongst the defendants and other entities and individuals.

The crux of the problem arises with the third factor—that the "enterprise" is an "ascertainable structure distinct from that inherent in a pattern of racketeering." *Atlas Pile*,

886 F.2d at 995; *see Kragness*, 830 F.2d at 855 ("An enterprise is established 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'") (quoting *Turkette*, 452 U.S. at 583, 101 S. Ct. 2514). "An enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *U.S. v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.), *cert denied*, 459 U.S. 1040, 103 S. Ct. 456, 74 L. Ed. 608 (1982); *see* Eighth Circuit Model Criminal Jury Instruction § 6.18.1692D at 440 (noting that to show an enterprise exists, "[t]he government must prove that the association had a structure distinct from that necessary to conduct the pattern of racketeering activity."). To meet this requirement the Complaint must plead an association in fact "that encompasses something more than what is necessary to commit the predicate RICO offense." *Gunderson*, 85 F. Supp. 2d at 916 (quoting *Diamonds Plus, Inc.*, 960 F.2d at 770). In this instance, the RICO claims are based on the allegation of a scheme to induce Schuster and Schlichte into investing personal funds, and to obtain loans for the purposes of further investment, in entities and schemes in which Anderson, Cleveringa and/or ASB had an interest or from which Anderson, Cleveringa and/or ASB would otherwise profit. A series of wire transfers were allegedly made by the defendants in furtherance of this scheme—and said wire transfers are plead as the predicate acts requisite to maintaining the plaintiffs' RICO claims. The plaintiffs, in their arguments in resistance to dismissal, indicate that they 'think' the evidence will show that Anderson and ASB, and Anderson and Cleveringa, had long-standing, symbiotic referral relationships, and that many of Cleveringa's contacts with Anderson were in Cleveringa's capacity as an ASB employee—but these are allegations that, so far as the court can tell, are not in the Complaint. Further, it stands to reason that the plaintiffs would not hand over their personal assets and/or loan proceeds to the defendants merely because the defendants asked them to—therefore, the defendants would

have had to conjure up a reason for the plaintiffs to do so (i.e. creation, real or fictional, of business or investment opportunities). However, this minimal association which is necessarily, and inherently, required to accomplish acts of racketeering is not sufficient for the law to recognize a group of otherwise unconnected individuals and entities as an "enterprise" for RICO purposes. *See Bledsoe*, 674 F.2d at 664. As such, the Complaint is deficient in that it fails to plead a RICO "enterprise" distinct from "'individuals who associate [to commit] sporadic crime.'" *Kehoe*, 310 F.3d at 586 (quoting *Kragness*, 830 F.2d at 855). As the Complaint has failed to adequately plead the "enterprise" requirement necessary to maintain the RICO claims in Counts XIV, XV and XVI, the defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6) in this regard are **granted.**

### 4. *Respondeat superior theory of liability against ASB*

#### a. *Arguments of the parties*

ASB argues a specific ground prevents the plaintiffs' from entertaining a civil RICO claim against it. ASB specifically argues that it can not be liable in a civil RICO claim based only on a *respondeat superior* theory of liability, and the plaintiffs have asserted no other theory of liability. ASB points out that the RICO claims against it hinge merely on the fact that Cleveringa was employed by ASB. ASB notes that this court, in *Gunderson v. ADM Investor Services, Inc.*, 2001 WL 624834 (N.D. Iowa Feb. 13, 2001), denied a defendant's summary judgment motion in a RICO *respondeat superior* claim and held that *Luthi v. Tonka Corporation*, 815 F.2d 1229, 1230 (8th Cir. 1997)—in which the Eighth Circuit Court of Appeals stated that "corporations will not be held liabile under RICO based solely on the *respondeat superior* doctrine"—applied only to cases where the defendant employer was both the "person" and the "enterprise" as defined by 18 U.S.C. § 1961. ASB's Brief at 9-10. ASB contends that *Gunderson* misread *Luthi*, as nothing in

*Luthi* limits it to cases in which the employer is treated as both a person and an enterprise. ASB claims that the United States Supreme Court decision in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)—in which ASB asserts the Court approved a rule that the "person" and "enterprise" must be distinct entities—casts doubt on this court's decision in *Gunderson*. Finally, ASB argues that the RICO claims against it cannot survive as the plaintiffs have claimed only that ASB "knew or should have known" that one of its employees was engaged in alleged racketeering activities, not that ASB participated or agreed to participate in any racketeering activities.

The plaintiffs resist ASB's argument that it cannot be liabile under the *respondeat superior* doctrine for Cleveringa's alleged RICO violations. The plaintiffs recognize the Eighth Circuit's holding in *Luthi* that *respondeat superior* cannot be used to impose RICO liability upon an entity, but note that subsequent decisions by Circuit Courts of Appeals and district courts have undercut the viability of *Luthi*. Specifically, the plaintiffs rely on this court's decision in *Gunderson* for their position. The plaintiffs further contend that though ASB argues that *Gunderson* was incorrectly decided, ASB offers no published case that calls *Gunderson*'s reasoning into question, and the two district court cases ASB cites were prior to *Gunderson*. The plaintiffs next discredit ASB's reliance on *Cedric* by pointing out that *Cedric* only noted that the issue of congressional intent with respect to application of *respondeat superior* to RICO claims was not before the Court—therefore, *Cedric* does not support ASB's position here. The plaintiffs next address ASB's citation to *K&S Partnership v. Continental Bank, N.A.*—which held that *Luthi* made it "absolutely clear" that "something more than vicarious liability was required to charge a corporation with the acts of its employees." Plf.s' Resistance at 19 (quoting ASB's Brief at 9). While the plaintiffs do *not* agree that something more is required, even if it were required the plaintiffs contend that 'something more' is present here: (1) ASB received substantial

interest from the fraudulent loans it granted to Schuster; (2) ASB senior management received a lien notice in July 2002 due to Yournet's cash flow problems and Cleveringa knew that Yournet had filed for bankruptcy as of July 25, 2002, but did not notify Schuster of these events and loaned Schuster $50,000 on July 30, 2002, and $1,200,000 on August 26, 2002 for purposes of investing in Yournet and Yournet related entities; (3) ASB allowed its bank officers to use the funds Schuster borrowed from ASB for purposes other than what Schuster intended them to be used for; and (4) in October 2002, ASB required Schuster put up additional collateral and personal assets to secure the fraudulently procured loans. In sum, the plaintiffs assert that "whether the simple principle of *respondeat superior* applies or something more is required, it is clear plaintiffs have alleged sufficient facts to overcome . . . ASB's Motion to Dismiss" the Civil RICO Counts. Plf.s' Brief at 20.

In reply, ASB pursues its argument that it cannot be held liable in Civil RICO under a *respondeat superior* theory of liability. ASB contends that as *Luthi* is the law of this Circuit, it must be followed in this instance as controlling law regardless of this court's contrary interpretation of the law in *Gunderson*. ASB also expresses its continued position that *Cedric* supports its position that *Luthi* is controlling precedent—and that *Cedric*'s mention of the issue, but failure to decide it, "shows that the issue is still a live one, even though it is now clear under RICO that the 'person' and the 'enterprise' must be distinct entities." ASB's Reply at 6 (quoting *Cedric*, 533 U.S. at 161-63, 166). Further, ASB asserts that this case is not one in which it would be appropriate to make an exception to *Luthi* as: (1) ASB's alleged connection to the racketeering is weak; (2) there is no allegation that bank management was involved in fraudulent activity; (3) there is no allegation that Cleveringa, despite his Vice President title, had a management role at ASB; (4) there are no allegations that ASB benefitted from the allegedly fraudulent investments;

and (5) there is no allegation that the Bank derived any benefit from Schlichte. Finally, ASB takes issue with the plaintiffs assertion in resistance that, alternatively, they have alleged the 'something more' required to rebuke a motion to dismiss—specifically, that no matter how the plaintiffs dress it, the theory remains one of *respondeat superior*, and nothing more.

### b. The law

ASB's arguments in this regard center around the holdings of three cases: *Luthi*, *Gunderson*, and *Cedric*. The court finds it prudent, at this time, to give a brief synopsis of the relevant findings of each of those cases with regard to *respondeat superior* liability for RICO violations.

In *Luthi*, the plaintiffs contended that the defendant should be held liable in RICO because its chief financial officer caused the plaintiffs' financial loss by committing fraudulent acts relating to the purchase of various corporations owned by the plaintiffs. *Luthi*, 815 F.2d at 1230. The district court dismissed the plaintiffs RICO claim—the only claim asserted—on the ground that RICO did not impose vicarious liability on the defendant corporation. *Id.* The Eighth Circuit Court of Appeals affirmed, concluding that RICO did not apply because the doctrine of *respondeat superior* is contrary to the purposes of RICO:

> "The premise of *respondeat superior* is that one who is without fault may be held vicariously liable for the wrongdoing of another. W. Prosser, Law of Torts 458 (4th ed. 1971). As our previous discussion of direct liability reveals, we think the concept of vicarious liability is directly at odds with the Congressional intent behind section 1962(c). Both the language of that subsection and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal "person" or "persons." Indeed, there is unlikely to be a situation, in the

> absence of an express statement, in which Congress more
> clearly indicates that *respondeat superior* is contrary to its
> intent."

*Luthi*, 815 F.2d at 1230. (quoting *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32 (1st Cir. 1986).

*Gunderson*, a decision by this court, arose from hedge-to-arrive ("HTA") contracts, contracts for sale and purchase of grain, that were entered into by grain producers and grain elevators. After consolidation of two large controversies, the grain producers filed a second amended complaint stating fifteen claims for relief—including several RICO claims under § 1962(c). The grain producers argued that a specific grain elevator, ADM, could be held liable in RICO under the doctrine of vicarious liability as ADM benefitted from its agents' actions. *Gunderson*, 2001 WL 624834 at *18. ADM moved to dismiss the claims against it, citing *Luthi* for the proposition that, as a matter of law, it could not be held vicariously liable under RICO. *Id.* In addressing this issue, this court noted that "*Luthi* and *Schofield [v. First Commodity Corp.*, 793 F.2d 28 (1st Cir. 1986)] . . . involved the "non-identity" rule which requires that the defendant to a RICO suit be a different entity than the 'enterprise' plead under § 1962(c)" *Id.* at *18 (citing cases). Also noted was the fact that *Luthi* and *Schofield*, as well as other cases denying vicarious liability, had been distinguished by subsequent courts based on specific concerns about the non-identity rule. *Id.* Further, *Gunderson* found that as ADM was not named as an enterprise in the second amended complaint, the non-identity rule was not implicated—and noted several decisions where non-identity was not an issue, in which courts permitted vicarious liability. *Id.* at 19. Ultimately, *Gunderson* rejected ADM's argument for dismissal, finding:

> The court concurs with the reasoning of those federal courts
> that have permitted vicarious liability and concludes that it is

appropriate for a court to assume that traditional rules of agency law apply to a federal statute when those traditional rules are consistent with the statute's purpose and Congress has not indicated otherwise. *See Schofield*, 793 F.2d at 33 (extent to which statute incorporates common law principles of agency liability depends on the extent to which the principles are consistent with the statute's language and purposes).

Here, the Producers seek to impose liability on ADM as a corporate "person." The Producers have alleged that ADM's agents actively promoted the scheme involving HTA contracts and benefitted from it through the manifest increase in corporate income. Under these well plead facts, the court concludes that ADM may be held vicariously liable under RICO for the alleged actions of its agents.

*Id.*

Finally, the court turns to *Cedric*—a United States Supreme Court case which ASB contends eviscerates this court's holding in *Gunderson*. In *Cedric*, the petitioner, a corporate boxing promoter, sued respondent Don King ("King") claiming that he had conducted, in part, the boxing-related affairs of Don King Productions (a corporation of which King was the president and sole shareholder) through a pattern of RICO activities. *Cedric*, 533 U.S. at 160-61, 121 S. Ct. 2087. The district court dismissed the complaint based on circuit precedent. *Id.* at 161, 121 S. Ct. 2087. The Second Circuit Court of Appeals affirmed the dismissal on the reasoning that § 1962(c) could apply "only where a plaintiff shows the existence of two separate entities, a 'person' and a distinct 'enterprise,' the affairs of which that 'person' improperly conducts" and that as King was legally "part of, not separate from, the corporation" "[t]here was no 'person,' distinct from the 'enterprise,' who improperly conducted the 'enterprises's affairs.'" *Id.* (quoting *Cedric Kushner Promotions, Ltd. v. King*, 219 F.3d 115, 116-17 (2d Cir. 2000)).

Ultimately, the Second Circuit held that as there was no distinction between a corporation and its president and sole shareholder, § 1962(c) did not apply. *Id.* When looking at this issue, the Supreme Court took a different view, stating: "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in [§ 1962(c)] that requires more 'separateness' than that." *Id.* at 163, 121 S. Ct. 2087. In addition, the Court noted that "linguistically speaking, the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner[— as] incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of natural individuals who created it, who own it, or whom it employs." *Id.* Finding that an individual employee, and a corporation which the employee solely owns, are distinct legal entities for purposes of RICO, and that such an interpretation was not disfavored by RICO's history, the Court ultimately stated:

> The alternative that we endorse, however, is no less consistent with [the principle that a corporation acts only through its directors, officers and agents; that a corporation should not be liable for the criminal of its employees where Congress intends no such liability; or that the Sherman Act's limitation on liability for criminal activities of a single firm]. It does not deny that a corporation acts through its employees; it says only that the corporation and its employees are not legally identical. It does not assert that ordinary *respondeat superior* principles make a corporation legally liable under RICO for the criminal acts of its employees; that is a matter of congressional intent not before us. *See, e.g.*, *Gasoline Sales, Inc.*, 39 F.3d at 73 (holding that corporation cannot be "vicariously liable" for § 1962(c) violations committed by vice president). Neither is it inconsistent with antitrust's law's intracorporate conspiracy doctrine; that doctrine turns on specific antitrust objections.

*See Copperweld Corp.*, *supra*, at 770-771, 104 S. Ct. 2731. Rather, we hold simply that the need for two distinct entities is satisfied; hence, the RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.

*Id.* at 166, 121 S. Ct. 2087.

### c.   *Analysis*

In this case the Complaint, with regard to ASB's liability for the RICO claim in Count XIV—and Counts XV and XIV by incorporation—reads:

172. [Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, Cleveringa, and ASB] along with Chuck Hinnenkamp, Daryl Witherspoon, Russ Barber, Creative Marketing, Team, Inc., WWFN, Yournet, Quan Capital Corporation, R-Chief, and Zaba Industries, constituted an enterprise consisting of an "association in fact.," as defined in 18 U.S.C. § 1961(1).

\* \* \*

174.   ASB's participation is based in part on the doctrine of respondeat superior or agency law with respect to Cleveringa's activities.  However, ASB also either knew or should have known unless it acted in reckless disregard that these wire transfers were being made and that they were part of a pattern of suspicious activity in these accounts and under the supervision of one loan officer, Cleveringa. *See* paragraphs 50, 51 and 52, *supra.*

175.  With respect to ASB's liability under the doctrine of respondeat superior or agency law, ASB benefited (sic) by these activities in that it was paid over $475,122 in interest payment on the loans, to include default interest, the proceeds of which were being transferred through the use of wire transfers.

Complaint at ¶¶ 172, 173, 174. In discussing the factual background, the Complaint additionally avers that ASB senior management was or should have been aware of Cleveringa's use of ASB to further a pattern of racketeering as: (1) Cleveringa devoted a substantial amount of time to Yournet related activities; (2) a large volume of money flowed through the Yournet entities' accounts, which were maintained by ASB, and such accounts were overdrawn on a number of occasions; (3) ASB was served with tax liens as early as July 2002 for Yournet's unpaid tax obligations; and (4) the United States District Court for the District of Minnesota sent a notice dated August 30, 2002 to ASB which indicated that Yournet had filed bankruptcy. Complaint at ¶¶ 50-52. Though the Complaint, and the plaintiffs in their resistance, indicate that ASB is liable in RICO *partially* under the doctrine of *respondeat superior*, the court can find no other basis from the Complaint under which ASB could be liable other than through vicarious liability—as there is no allegation other than that ASB knew or should have known but for reckless disregard of the facts of Cleveringa's racketeering activities and predicate wire frauds. Therefore, the court finds, for purposes of the motions to dismiss, that the Complaint asserts that vicarious liability is the basis for ASB's RICO liability.

With that established, the court turns to ASB's contention that *Gunderson* was incorrectly decided and was called into question by *Cedric*. *Cedric*, by its own admission, dictates only that a corporation, and its sole shareholder and president are distinct 'persons'—if so plead—under RICO. *Cedric*, 533 U.S. at 166, 121 S. Ct. 2087. *Cedric* also expressly recognized that the issue of whether "ordinary *respondeat superior* principles make a corporation legally liable under RICO for the criminal acts of its employees" was a "matter of congressional intent not before the Court." *Id.* Further, the case cited by the Court, as holding that a corporation could not be vicariously liable for

RICO violations committed by its vice president—*Gasoline Sales, Inc. v. Aero Oil Company*, 39 F.3d 70 (3d Cir. 1994)—is distinguishable from this case. In *Gasoline Sales* the plaintiffs generally asserted they were injured by the defendants' RICO violations under § 1962. *Id.* at 71. The defendants were comprised of a corporation ("Getty"), Getty's wholly-owned subsidiaries "Aero" and "Reco," Getty's senior vice-president Alvin Smith ("Smith") and Aero's general manager Jerry Lank ("Lank"). *Id.* With respect to the RICO claim, the complaint asserted that Getty (the corporation), Smith and Lank were "persons" conducting the "enterprises" comprised of Aero and Reco. *Id.* at 72-73. After noting that only "persons" can be held liable for § 1962(c) violations, the Third Circuit found:

> Because [the plaintiff] has alleged that Aero and Reco were conducted as "enterprises" in violation of section 1962(c), and because we have held that enterprises cannot conduct themselves within the meaning of section 1962(c), [the plaintiff] cannot sue Aero or Reco under section 1962(c). *B.F. Hirsh v. Enright*, 751 F.2d at 633-34; *Banks v. Wolk*, 918 F.2d at 421; *Kehr Packages*, 926 F.2d at 1411. For the same reason, Aero cannot be vicariously liable for any 1962(c) violation committed by Lank, its vice president, in conducting Aero through a pattern of racketeering. *Petro-Tech*, 824 F.2d at 1351, 1358-60, *Kehr Packages*, 926 F.2d at 1411.

*Id.* at 73. Factual discrepancies aside,[7] in the first instance, the Third Circuit recognized

---

[7] The factual discrepancy the court speaks of is the Third Circuit's mention of Lank as Aero's vice-president in discussing vicarious liability, when in the factual background Lank was described as Aero's general manager, while Smith was described as the senior vice-president of Getty—the parent corporation and an entity identified as a "person" in the RICO claim. *Compare Gasoline Sales*, 39 F.3d at 71 ("Aero's general manager, Jerry T. Lank"), *with*, *Gasoline Sales*, 39 F.3d at 73 ("Aero cannot be vicariously liable for any 1962(c) violation committed by Lank, *its vice president*") (emphasis added). The court,

(continued...)

that a defendant plead as an "enterprise" could not be liable under RICO, as RICO imposes liability only on "persons." *See id.* Second, the Third Circuit held that this principle cannot be thwarted by application of vicarious liability to allow a "person" to impute RICO liability to an "enterprise" under § 1962(c)—as this would circumvent RICO's explicit language that *only* a "person" can be liable in RICO. *See id.* This is *the same* distinction that this court recognized in *Gunderson* as common amongst cases—particularly *Luthi* and *Schofield*—which held that RICO liability could not be extended vicariously to an entity plead as a RICO "enterprise." *See Gunderson*, 2001 WL 624834 at *19 ("*Luthi* and *Schofield* and the other cases cited above, however, all involved the "non-identity" rule which requires that the defendant to a RICO suit must be a different entity than the 'enterprise' plead under § 1962(c)."); *see also Petro-Tech, Inc. v. Western Comp. of N. Am.*, 824 F.2d 1349, 1351 (3d Cir. 1987) ("Unless the employer is the § 1962(c) enterprise at the same time as its employees are the § 1962(c) persons, however, vicarious liability may be appropriate."); *Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 453 (E.D.N.Y. 1987) (noting that *Luthi* and *Schofield* dealt with "conceptually distinguishable problems of whether a corporation that is the RICO 'enterprise' can be vicariously liable under section 1962(c) for the actions of an employee who is the RICO 'person.'"). Another basis on which to distinguish *Luthi* and *Schofield* was advanced by *Davies v. Mutual Life Insurance Co. of New York*, 6 F.3d 367 (6th Cir. 1993)—in which the Sixth Circuit Court of Appeals found that *Luthi* did not decide the question of whether vicarious liability theory could be advanced where plaintiffs alleged that corporate defendant "knowingly sponsored and *benefitted*" from agent's racketeering activity. *Id.*

---

[7](...continued)
at this juncture, does not opine as to whether this apparent discrepancy could have altered the Third Circuit's analysis of the issue.

at 379 (emphasis in original). For these reasons, the court is *not* persuaded by ASB's arguments that *Gunderson* incorrectly decided that vicarious liability theory was available where a corporate defendant was not the alleged enterprise—and reaffirms *Gunderson*'s finding that vicarious liability can be used where the corporate entity is alleged to be a "person," not an "enterprise."

In this case, the court finds that *Gunderson* applies to allow the plaintiffs to claim ASB vicariously liable under RICO for Clevergina's actions. *See Gunderson*, 2001 WL 624834 at *19. Here, the plaintiffs do *not* claim that ASB was the RICO enterprise, but rather seeks to hold ASB liable as a "person" that formed a part of the enterprise identified as an association in fact comprised of ASB, Cleveringa, Anderson, F.H. Anderson Company, P.C., F.H. Anderson Company, the various 'shell' entities created for the purpose of attracting investors and a couple of other individuals. As ASB's liability is predicated on its role as a "person," and not as the "enterprise," under *Gunderson*, the doctrine of respondeat superior can be utilized to hold ASB responsible for the racketeering acts of its Vice-President Cleveringa. Further, as in *Davies*, the Complaint alleges—and the court must accept as true on a Rule 12(b)(6) motion to dismiss—that ASB benefitted from Cleveringa's activities to the tune of nearly half a million dollars in interest it acquired off of the loans Schuster procured for purposes of investing in the Yournet related entities and/or the Witherspoon affair coupled with the fact that several of the Yournet related entities' accounts were also held and managed by ASB. *See Davies*, 6 F.3d at 379; Complaint at ¶¶ 57-61. In sum, the court finds that plaintiffs may assert that ASB is vicariously liable, as a "person," for violations of §§ 1962(b), (c) and (d).

As the court has determined that the RICO claims are plead with the particularity required by Rule 9(b), that the enterprise requirement is adequately plead, and that the plaintiffs can assert a respondeat superior theory of liability over ASB as a "person" in

RICO, the defendants' motions attacking these aspects of the RICO claims in Counts XIV, XV, and XVI are **denied.**

### 5. *Ultimate disposition of RICO claims*

As the court has found that the Complaint, in terms of the RICO violations alleged in Counts XIV, XV, and XVI are deficient under Rule 12(b)(6) in terms of pleading the "enterprise" requirement with regard to F.H. Anderson Company, P.C. and F.H. Anderson Company, the court grants the defendants' motion to dismiss with respect to those counts. However, in the event that the court granted the motions to dismiss in this regard, the plaintiffs have requested another opportunity to amend the complaint to remedy the specific deficiencies. As the defendants have noted, the plaintiffs have already sought, and been granted, an opportunity to file an amended complaint in this matter. However, the court concludes that several unique circumstances of this litigation justify granting the plaintiffs one additional opportunity to remedy the maladies in their RICO claims. Specifically, in deciding that leave to amend should be granted, the court recognizes the following: (1) when the original complaint was filed both Schuster and Schlichte had retained the same counsel—after which possible conflicts of interest arose which resulted in withdrawal of counsel, procurement of new counsel, and subsequent withdrawal of replacement counsel, from representation of Schuster and Schlichte and requiring both Schuster and Schlichte to obtain new, separate representation at least twice (*see* Doc. Nos. 22, 28, 42); (2) the Second Amended and Substituted Complaint (the Complaint at issue here) was the only such complaint filed after the retention of plaintiffs' current counsel (Doc. No. 44); and (3) the Complaint alleges, and the court assumes as true, that plaintiff Schuster has suffered a stroke, which will likely prolong the discovery of facts which could otherwise be readily discoverable (*See* Complaint at ¶¶ 18, 26, 36). For these reasons, and in the interest of justice, the court will grant the plaintiffs leave to amend the

Complaint with respect to Counts XIV, XV and XVI.

The court will now go on to consider the various other rationales for dismissal asserted by the pending motions to dismiss.

### C. Breach of Fiduciary Duty Claims—Counts IV & XX

### 1. The Complaint

Count IV of the Complaint is a claim by Schuster against Anderson, F.H. Anderson, P.C. and F. H. Anderson Company (collectively, in reference to this Count, the "Anderson defendants") for breach of fiduciary duty. Specifically, the Complaint states:

> 83. At least as early as 1994 and continuing through 2004, a fiduciary relationship existed between Schuster and Anderson, F.H. Anderson Company, P.C. and F.H. Anderson Company (hereinafter in Count IV referred to as "these defendants.")
>
> 84. These defendants breached their fiduciary duties owed to Schuster by: (1) failing to provide him with full and complete information in their possession in order for him to make an informed decision about whether to accept these defendants' investment recommendations; (2) misappropriating Schuster's money; and (3) perpetrating a fraud on Schuster.
>
> 85. These breaches of their fiduciary duties were a proximate cause of damages to Schuster.
>
> 86. These breaches of their fiduciary duties amounted to a willful and wanton disregard for Schuster's rights.

Complaint at ¶¶ 83-86.

Count XX[8] of the Complaint is a claim by Schlichte against the Anderson

---

[8]As the plaintiffs correctly note in their combined resistance, though the Anderson

(continued...)

defendants for breach of fiduciary duty:

> 202. At all relevant times, an accountant-client relationship existed between [the Anderson defendants] and one or more of the entities in which Schuster (sic) was enticed to invest including, but not limited to, Sports Mailbox, Inc.
>
> 203. As accountant for these entities, Anderson owed investors and Schlichte, in particular, a fiduciary duty.
>
> 204. [The Anderson defendants] breached their fiduciary duty they owed to Schlichte by: (1) providing him false or failing to provide him with full and complete information in their possession in order for him to make an informed decision about whether to accept these defendant's or Cleveringa's investment recommendations; (2) misappropriating Schlichte's investment money; and (3) perpetrating a fraud on Schlichte.
>
> 205. These breaches of their fiduciary duty were a proximate cause of damages to Schlichte.
>
> 206. These breaches of their fiduciary duties amounted to a willful and wanton disregard for Schlichte's rights.

Complaint at ¶¶ 202-206.

## 2. *Arguments of the parties*

The Anderson defendants, in their motion to dismiss, claim that Schuster's breach of fiduciary duty claim fails because Schuster failed to allege facts to support his claim that a fiduciary relationship existed. The Anderson defendants contend that the *only* allegation in the Complaint to such an effect is that Anderson acted as the accountant for Schuster,

---

[8] (...continued)
defendants' brief only argues for dismissal of Count IV on the basis that a fiduciary duty did not exist between Schuster and the Anderson defendants, the Anderson defendants' actual motion to dismiss also asserts this ground for dismissal of Count XX advanced by Schlichte. The court will, therefore, address both Counts VI and XX as the basic issue, and argument for dismissal, applies to both counts.

Schuster Co. and LTT for more than twenty years. Additionally, the Anderson defendants argue that there is nothing in Iowa law that an accountant-client relationship creates a fiduciary duty, and that superior knowledge alone does not demonstrate the existence of a special relationship of trust. In support of their position the Anderson defendants cite a Sixth Circuit case which they claim found no fiduciary duty running from the seller of life insurance to the plaintiff-buyer was generated based solely on superior knowledge of the seller. *See* Brief in Support of Defendants, Fay Anderson, F.H. Anderson Company, P.C., and F.H. Anderson Company's Renewed Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) ("The Anderson Deft.s' Brief"), Doc. No. 56, at 10 (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999).

The plaintiffs resists the Anderson defendants' motion to dismiss the fiduciary duty claim embodied in Count IV. The plaintiffs cite *Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970), as supporting an assertion that a confidential relationship can be formed between a bank and customer borrowing money from that bank. From this, the plaintiffs analogize that "[i]f a confidential relationship may be found between a bank and a borrower when the borrower trusts the loan officer implicitly then the same must be true if the same degree of trust arises in the relationship between an accountant and his client." Plf.s' Resistance at 25. The plaintiffs assert that the Complaint additionally alleges that Anderson knew or should have known, from "Plaintiffs' mannerisms, to include the lack of questioning him, as well as reactions to Anderson's investment advice, that Plaintiffs trusted him implicitly." Complaint at ¶ 17. The plaintiffs allege that the coupling of the plaintiffs' implicit trust in Anderson's advice with Anderson's superior knowledge as to the investments he was proposing, gives rise to a fiduciary duty in the Anderson defendants. Additionally, the plaintiffs cite this court's jury instructions describing a "fiduciary relationship" in *Top of Iowa Cooperative v. Schewe*, 149 F. Supp. 2d 709, 717

n.1 (N.D. Iowa 2001), and contend that under that instruction the plaintiffs have sufficiently, and appropriately, plead the existence of a fiduciary relationship with regard to Schuster—specifically in that the Complaint asserts a long-standing relationship between Schuster and Anderson which generated Schuster's implicit trust, Anderson's superior knowledge about the investments he recommended, and Anderson's knowledge that Schuster had suffered a stroke in recent years which affected his judgment. Schlichte avers that the Anderson defendants failed to make any mention of Count XX in their brief, the court should overrule the mention of dismissal of Count XX in the Anderson defendants' motion. Further, Schlichte alleges that the Complaint sufficiently alleges a fiduciary relationship between himself and Anderson, pointing specifically to: (1) allegations that Anderson induced Schlichte to invest approximately $850,000 in Yournet, Yournet related entities and the Witherspoon affair: (2) allegations that Anderson provided Schlichte with investment advice; (3) allegations that Anderson used his long-standing relationship with Schuster to entice Schlichte into investing into schemes in which Anderson had an interest; (4) allegations of Anderson's superior knowledge regarding the investment recommendations; and (5) allegations that Anderson knew or should have known that Schlichte trusted him implicitly. Further, Schlichte and Schuster assert that Anderson may have been the accountant for many of the fraudulently formed entities—including at least Sports Mailbox, Inc. In sum, Schlichte contends that Anderson's enhanced role in the scheme to defraud, coupled with his role as an investment advisor to Schlichte, support the existence of a fiduciary duty, and form the basis of his breach of fiduciary duty claim in Count XX.

Though the Anderson defendants filed a reply, they did not assert any additional arguments in support of their position that Counts VI and XX should be dismissed.

### *3.      Breach of fiduciary duty under Iowa law*

To establish a breach of fiduciary duty, the plaintiff must demonstrate the following elements: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached this fiduciary duty; (3) the breach of the fiduciary duty was a proximate cause of the plaintiff's damages; and (4) the amount of damages. *Top of Iowa Co-op. v. Schewe*, 149 F. Supp. 2d 709, 717 (N.D. Iowa 2001); *see also Gunderson*, 85 F. Supp. 2d at 920-21; *Shivvers v. Hertz Farm Mgmt., Inc.*, 595 N.W.2d 476, 480 (Iowa 1999) ("The existence of a fiduciary relationship necessarily assumes one of the parties has a duty to act for or to give advice for the benefit of the other upon matters within the scope of the fiduciary duty."). As this court has previously explained, the Iowa Supreme Court has defined a fiduciary duty as follows:

> "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 186) (citing Restatement (Second) of Torts § 874 cmt. a (1979)).  We have also noted that
>> a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind . . . .   The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The] [p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."
>
> *Hoffmann v. Nat'l Med. Enters., Inc.*, 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman*, 113 N.W.2d 254, 256 (1962)). . . .
>
> . . . . [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse,

any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth*, 380 N.W.2d at 696.

*Oeltjenbrun v. CSA Investors, Inc.*, 3 F. Supp. 2d 1024, 1053 (N.D. Iowa 1998) (quoting *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied*, 522 U.S. 810, 118 S. Ct. 52, 139 L. Ed. 2d 17 (1997)); *see also Gunderson*, 85 F. Supp. 2d at 920-21 (quoting *Oeltjenbrun*); *Corcoran v. Land O'Lakes, Inc.*, 39 F. Supp. 2d 1139, 1154 (N.D. Iowa 1999) (quoting *Oeljenbrun*). These sentiments are echoed in the Iowa Model Civil Jury Instructions, which direct that

> . . . a fiduciary relationship is a relationship of trust and confidence on a subject between two persons. One of the persons is under a duty to act for or give advice to the other on that subject. Confidence is placed on one side, and domination and influence result on the other.
>
> Circumstances that may give rise to the existence of a fiduciary relationship include the acting of one person for another, the having and exercising of influence over one person by another, the placing of confidence by one person in another, the dominance of one person by another, the inequality of the parties, and the dependence of one person upon another. None of these circumstances is more important than another. . . .

Iowa Model Civil Jury Instructions 3200.2 (2002); *see also Top of Iowa Co-op.*, 149 F. Supp. 2d at 718 (with regard to existence of a fiduciary relationship, instructing the jury, in part, that "[a] fiduciary relationship can therefore exist when the evidence indicates that (1) one of the parties enjoyed superior or excessive influence over the other; (2) the parties had a confidential relationship and one of the parties had greater access to facts and legal resources; or (3) there was a disparity of business experience and an invitation to the party with lesser experience to place confidence in the advice of the other party"). Ultimately,

under Iowa law, the "'circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of the individual case.'" *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 648 (Iowa 1995) (quoting *Kurth*, 380 N.W.2d at 696).

### 4. *Analysis*

In addition to what is asserted in the bodies of Counts IV and XX, as quoted above, the Complaint contains additional assertions with regard to Schuster's and Schlichte's relationship with Anderson. First, the Complaint establishes that Anderson was, at all relevant times, a public accountant as well as an "employee, owner and/or agent" of F.H. Anderson Company, P.C. and F.H. Anderson Company. Complaint at ¶ 7. With regard to Schuster, the Complaint avers that (1) Anderson had acted as the accountant for Schuster individually, and for Schuster's business including plaintiffs Schuster Co. and LTT, for over twenty years; (2) Anderson provided investment advice to Schuster throughout this period, and encouraged Schuster's investment in schemes in which Anderson had an interest; (3) Anderson was in a position of superior knowledge about the investments he recommended to Schuster; (4) Anderson knew that Schuster had suffered a stroke in recent years that affected his judgment; (5) Anderson was or should have been aware, due to Schuster's mannerisms and lack of questioning, that Schuster trusted Anderson implicitly; and (6) Anderson's services to Schuster were confidential. *Id.* ¶¶ 13-14, 16-19. As to Schlichte, the Complaint asserts that: (1) Anderson used his long-standing relationship with Schuster as leverage to get Schlichte to invest in entities or schemes in which Anderson had an interest; (2) Anderson should have been aware that Schlichte trusted him implicitly due to Schlichte's lack of questioning regarding Anderson's recommendations and Schlichte's mannerisms; (3) Anderson was in a position of superior knowledge regarding the investments he recommended; and (4) Anderson's services to Schlichte were

confidential in nature. *Id.* ¶¶ 15-17, 19.

Taking the allegations in the Complaint as true, the court finds that the plaintiffs have plead sufficient facts to state a claim for relief for breach of fiduciary duty. Here, construing the facts of the Complaint as true, Schuster had a long-standing relationship of trust and confidence with Anderson in terms of investment advice and implicitly trusted Anderson's judgment and recommendations—a relationship which Anderson used as leverage to gain the trust of Schlichte. Moreover, Anderson knew that Schuster had recently suffered a stroke which affected his judgment and made him more susceptible to Anderson's advice Anderson had superior knowledge regarding his investment recommendations, and recommended that Schlichte and Schuster invest in entities or schemes that Anderson had an interest in. Further, Anderson should have known of this implicit trust as a result of Schuster and Schlichte's reactions to Anderson's investment advice—including a lack of questioning and their other mannerisms. Here, the plaintiffs firmly claim that Anderson "enjoyed superior or excessive influence" over them, and that "the parties had a confidential relationship [in which Anderson] had greater access to facts and legal resources." *Top of Iowa Co-op.*, 149 F. Supp. 2d at 718. Finding that the plaintiffs have stated a claim for breach of fiduciary duty is especially appropriate under Iowa law as Iowa has not constrained recognition of a fiduciary duty to rigid categories, but to the contrary recognizes that "'circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of the individual case.'" *Economy Roofing & Insulating*, 538 N.W.2d at 648 (quoting *Kurth*, 380 N.W.2d at 696). Therefore, the Anderson defendants' motion to dismiss, insofar as it seeks dismissal of the breach of fiduciary claims embodied in Counts IV and XX, is **denied.**

### D. Fraudulent Misrepresentation And Fraudulent Nondisclosure—Counts VI & VII

#### 1. The Complaint

Count VI of the Complaint is a claim by Schuster against Anderson, F.H. Anderson, P.C. and F. H. Anderson Company (collectively, in reference to this Count, the "Anderson defendants") for fraudulent misrepresentation. Specifically, the Complaint states:

> 93. [The Anderson defendants], on the dates set forth in paragraph 57 regarding loans made to Schuster, and in paragraph 62 relating to investments made by Schuster, made representations to Schuster that the recommended investments were good investments, that were safe and would return a good profit on Schuster's investments.
>
> 94. On most, if not all of these occasions, these representations were made either at Schuster's primary business in Le Mars, Iowa, or at ASB in Sioux Center, Iowa, or at Anderson's primary place of business in Orange City, Iowa.
>
> 95. The representations were false.
>
> 96. The representations were material.
>
> 97. [The Anderson defendants] knew the representations were false.
>
> 98. [The Anderson defendants] intended to deceive Schuster.
>
> 99. Schuster acted in reliance on the truth of the representations and was justified in relying on their representations.
>
> 100. The representations were the proximate cause of Schuster's damages.
>
> 101. These representations amounted to a willful and wanton disregard for Schuster's rights.

Complaints at ¶¶ 93-101.

Count VII of the Complaint is a claim by Schuster against the Anderson defendants for fraudulent nondisclosure.  Specifically, Count VII states:

> 103. [The Anderson defendants], on the dates set forth in paragraph 57 regarding loans made to Schuster, and in paragraph 62 relating to investments made by Schuster, owed Schuster a duty of disclosure, due to the relationship of special trust and confidence that Schuster had with these defendants.
>
> 104.   While such a relationship existed, these defendants were aware that the recommended investments were not good investments, that instead they were unsafe investments that would not return a good profit to Schuster.
>
> 105.   While such a relationship existed, these defendants concealed or failed to disclose the knowledge that the recommended investments were not good investments, that instead they were unsafe investments that would not return a good profit for Schuster.
>
> 106.  The undisclosed information was material to the transaction.
>
> 107.   [The Anderson defendants] knowingly failed to make the disclosures.
>
> 108. [The Anderson defendants] intended to deceive Schuster by withholding such information.
>
> 109.   Schuster acted in reliance upon the defendants' failure to disclose and was justified in such reliance.
>
> 110.  The failure to disclose was a proximate cause of Schuster's damages.
>
> 111.  These failures to disclose amounted to willful and wanton disregard for Schuster's rights.

Complaint at ¶¶ 103-111.

Both Counts VI and VII refer to paragraphs 57 and 62 of the Complaint.  Paragraph 57 sets forth a series of loans that ASB made to Schuster from November 1, 2000 through December 31, 2002.  Complaint at ¶ 57.   Paragraph 62 details a series of investments—funded by either Schuster's personal assets or the loan proceeds of paragraph

57—that Cleveringa and Anderson "induced" Schuster to make in their fraudulent schemes. *Id.* ¶ 62.

## 2.    *Arguments of the parties*

Generally, the Anderson defendants argue that Count VI fails to plead fraud with the particularity required by Rule 9(b). Specifically, the Anderson defendants aver that the pleading is defective in that it sets forth only conclusory statements, and fails to plead the time, place, and specific content of the allegedly fraudulent representations. The Anderson defendants contend that Count VI merely references dates, loan numbers and loan amounts made by ASB to Schuster and that this information does nothing to enhance Schuster's fraudulent misrepresentation claim against the Anderson defendants in terms of pleading with Rule 9(b) specificity. Ultimately, as the pleading of Count VI does not set forth with specificity the time, place, and content of any alleged misrepresentation, the Anderson defendants argue for Count VI's dismissal. Additionally, the Anderson defendants argue for dismissal of Schuster's fraudulent nondisclosure claim embodied in Count VII on the same grounds as the fraudulent misrepresentation claim—specifically, that Schuster fails to plead the claim with the specificity required by Rule 9(b). The Anderson defendants also aver that the Complaint fails to describe the types of information that were withheld from Schuster which could amount to fraudulent nondisclosure. Finally, the Anderson defendants argue that Schuster's statement that they "concealed or failed to disclose the knowledge that the recommended investments were not good investments" is far to general to meet the requirements of Rule 9(b) specificity.

In his resistance, Schuster concedes that the fraudulent misrepresentation and fraudulent nondisclosure claims—such as those he advances in Counts VI and VII—fall under Rule 9(b)'s purview. Schuster does, however, dispute the Anderson defendants' contention that he has failed to plead fraud with the particularity required by Rule 9(b).

Schuster asserts that "[t]hough the particularity requirement of pleading the specific predicate acts in a RICO claim as compared to pleading specific acts in a fraud claim arise under separate laws, they are very similar if not identical requirements." Plf.s' Resistance at 30. As such, Schuster incorporates his argument in resistance to dismissal of the RICO claims for failure to plead fraud with particularity as his argument for why the fraudulent mispresentation and fraudulent nondisclosure claims, in turn, plead fraud with the requisite particularity. Schuster claims that it is clear that the Complaint contains the required speificiaty and sets forth the time, place and content of the false representations, in addition to the identity of the persons making those representations or omissions. As such, Schuster contends that the Anderson defendants' motion to dismiss Counts VI and VII should be denied.

In reply, the Anderson defendants contend that Schuster confuses pleading the underlying wire transfers with particularity with pleading the circumstances constituting fraud with particularity. The Anderson defendants argue that fraudulent misrepresentation requires a showing of both false representation and an intent to deceive, and fraudulent nondisclosure requires a showing of intent and withholding of facts material to the transaction. The specific time, dates and contents of the wire transfers, according to the Anderson defendants, is completely distinct from pleading the required elements of false representation or withholding of material facts with Rule 9(b) particularity. As such, the Anderson defendants assert they are entitled to dismissal of Counts VI and VII with prejudice, and that Schuster should not be given another opportunity to plead fraud with particularity.

### 3. Fraudulent misrepresentation and fraudulent nondisclosure under Iowa law

As this court has explained on a number of occasions, "[t]he required elements of fraudulent misrepresentation under Iowa law are: (1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *Schaller Telephone Co. v. Golden Sky Systems, Inc.*, 139 F. Supp. 2d 1071, 1104 (N.D. Iowa 2001) (quoting *Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797, 819 (N.D. Iowa 2000), in turn citing *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1055 (N.D. Iowa 1999)) (internal quotations and citations omitted)); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 844 (N.D. Iowa 2004) (same); *Williams v. Security Nat'l Bank of Sioux City, Iowa*, 293 F. Supp. 2d 958, 971 (N.D. Iowa 2003) (same); *Gunderson v. ADM Investor Servs., Inc.*, 85 F. Supp. 2d 892, 922 (N.D. Iowa 2000) (same); *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812 (N.D. Iowa 1997) (same); *Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1473 (N.D. Iowa 1996) (same); *accord Smidt v.* Porter, 695 N.W.2d 9, 22 (Iowa 2005) ("The elements of fraudulent misrepresentation are (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury."); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004) (citing elements); *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001) ("To establish a claim of fraudulent misrepresentation, a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages.") "The representation or promise,

however, need not be an affirmative misstatement, as fraud may also arise from a failure to disclose material facts." *Id.* (citing *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987) (citation omitted)); *see BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 961 (8th Cir. 2003) ("'concealment of or failure to disclose a material fact can constitute fraud in Iowa.'") (quoting *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987)). Additionally, the plaintiff must show that the defendant was under a legal duty to communicate the withheld information to prevail on a fraudulent nondisclosure claim. *See id.* The plaintiff need not show a fiduciary duty existed to prevail, and may, rather, establish that a duty arose from "inequality of condition and knowledge, or other circumstances shown by a particular fact situation." *Irons v. Community State Bank*, 461 N.W.2d 849, 854 (Iowa Ct. App. 1990); *see Schaller Telephone Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir. 2002) (noting that under Iowa law a duty to reveal arises when "'one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction.'") (quoting *Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996)). The plaintiff must prove the elements of fraudulent misrepresentation or fraudulent nondisclosure by clear and convincing evidence. *Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797, 820 (N.D. Iowa 2000); *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999); *see also Ralfs v. Mowry*, 586 N.W.2d 369, 373 (Iowa 1998) (describing the burden as proving the existence of fraud "by clear, satisfactory, and convincing evidence") (citing *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995). Both fraudulent misrepresentation and fraudulent nondisclosure claims must be plead with the particularity required by Rule 9(b), as discussed *supra* part II.B.2.b. *See, e.g.*, *Williams*, 293 F. Supp. 2d at 971; *Wright*, 114 F. Supp. 2d at 835; *see Roberts v. Francis, M.D.*, 128 F.3d 647, 651 (8th Cir. 1997) (analyzing whether or not plaintiff's fraudulent concealment claim was

plead with particularity in accord with Rule 9(b)).

### 4.  *Analysis*

Turning first to the fraudulent misrepresentation claim in Count VI, the Complaint asserts that on the dates that the loans were made to Schuster and on the dates Schuster made investments in Yournet, the Yournet related entities and/or the Witherspoon affair, that the Anderson defendants "made representations to Schuster that the recommended investments were good investments, that were safe and would return a good profit on Schuster's investments," and that these representations were made at either "Schuster's primary business office in Le Mars, Iowa, or at ASB in Sioux Center, Iowa, or at Anderson's primary place of business in Orange City, Iowa."Complaint at ¶¶ 93-94.  The Complaint further asserts that the allegedly fraudulent misrepresentations were made "on the dates set forth in paragraph 57 regarding loans made to Schuster, and in paragraph 62 relating to investments made by Schuster." *Id.* ¶ 93.  As previously noted in discussion of the RICO claims above, these paragraphs set forth specific loans acquired by Schuster from ASB, and specific investments Schuster made in Yournet, Yournet related entities and/or the Witherspoon affair.  The court finds the structure of the fraudulent misrepresentation claim, in terms of pleading the circumstances constituting fraud, to be analytically identical to that of the RICO claims in Counts XIV, XV and XVI as discussed in Part II.B.2.d.ii, *supra.*  As with the RICO claims, the court finds that the Complaint pleads with sufficient particularity the claim of fraudulent misrepresentation in Count VI—it pleads with particularity sufficient to place the defendants on notice that their representations as to the quality of the investments specified in paragraph 62, and the propriety of procuring funds for further investments via loans from ASB as specified in paragraph 57, made at one of the three discrete locations listed, are the subject of this claim. *See Commercial Property*, 61 F.3d at 644 ("one of the main purposes of [Rule 9(b)]

is to facilitate the defendant's ability to respond and prepare a defense to charges of fraud'); *Bennett*, 685 F.2d at 1062 (noting that Rule 9(b) requires particularity in the "time, place and content of false representations, as well as the identity of the person making the representation") Therefore, the Anderson defendants' motion to dismiss the fraudulent misrepresentation claim in Count VI is **denied**.

The court turns next to the claim of fraudulent nondisclosure embodied in Count VII of the Complaint. The Complaint asserts that the Anderson defendants, who had a "relationship of special trust and confidence" with Schuster, were aware that the recommended investments were not "good investments" and that they "would not return a good profit" for Schuster and "concealed or failed to disclose the knowledge that the recommended investments were not good investments [and were rather] unsafe investments that would not return a good profit to Schuster." Complaint at ¶¶ 103-105. Notably, in the claim, Schuster "incorporates by reference paragraphs 1 through 69 as though fully set forth herein"—paragraphs 1-69 encompass the portion of the Complaint setting forth the factual background, the relationships between the plaintiffs and the defendants, the interconnectedness of the defendants, the creation of various business entities, the allegations of the defendants' (including the Anderson defendants') personal interests in some of the entities in which investments were recommended, as well as the specific dates that Schuster took out loans from ASB due to the Anderson defendants "inducement," the specific investments Schuster made, as well as particular wire transfers made to accomplish the objectives of the fraudulent scheme asserted by the plaintiffs. The court finds that Count VII, taken with the paragraphs incorporated by reference describing generally the relationships and interconnectedness of the Anderson defendants to the alleged scheme to defraud the plaintiffs, states the claim with sufficient particularity to place the Anderson defendants' on notice as to the nature of the information the claims contend they

fraudulently concealed. Further, paragraph 57 describing the loans Schuster was induced to take out from ASB for further investment, and paragraph 62 describing Schuster's specific investments, set forth the dates, times, and locations at which the Anderson defendants had a duty to disclose their underlying relationship with the other defendants, with the particular investment, and the knowledge that the particular investment/loan was not a viable investment for the reasons set forth in paragraphs 1 through 69. *See Commercial Property*, 61 F.3d at 644 ("one of the main purposes of [Rule 9(b)] is to facilitate the defendant's ability to respond and prepare a defense to charges of fraud."). For these reasons the court finds that the fraudulent nondisclosure claim is plead with sufficient particularity to survive the Anderson defendants' Rule 9(b) challenge for particularity, and, likewise, the Anderson defendants' motion to dismiss in this regard is **denied**.

### *E.  Subject Matter Jurisdiction—Counts I, II & III*

#### *1.    The Complaint*

The Anderson defendants, in addition to defendants Carl Anderson and Anderson Accounting & Tax Services (collectively the "Carl Anderson defendants"), seek dismissal of Counts I, II, and III on the basis of lack of supplemental jurisdiction. To understand the arguments of the defendants in regard to dismissal of Counts I, II, and III, the court will briefly set forth the context of each of these Counts. In Count I, Schuster asserts a claim of professional negligence against the Anderson defendants based on negligent preparation of Schuster's federal and state tax returns for tax years 2001, 2002 and 2003. In Count II, Schuster Co. asserts a claim of professional negligence against the Anderson defendants and the Carl Anderson defendants for negligently preparing Schuster Co.'s state tax returns for tax years ending May 31, 1996 through May 31, 2001 and federal tax

returns for the tax years ending May 31, 2000 through May 31, 2001. In Count III, LTT asserts a claim of professional negligence against the Carl Anderson defendants for negligently preparing LTT's federal and state tax returns for tax yeras ending May 31, 1996 through May 31, 2001. With the nature of Counts I-III in mind, the court now turns to the arguments of the parties.

### 2. General law regarding subject matter jurisdiction

Section 1367 of Title 28 of the United States Code governs a district court's supplemental jurisdiction, and lack thereof, over state law claims:

> **(a)** Exception as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims *that are so related to claims in the action within the original jurisdiction that they form part of the same case or controversy* under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve joinder or intervention of additional parties.

28 U.S.C. § 1367(a) (emphasis added). Whether a court has supplemental jurisdiction is determined by the following test: "'a federal court has jurisdiction over an entire action, including state-law claims, wherever the federal-law and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.''" *Kansas Public Employees Retirement Sys. v. Reimer & Koger, Assoc., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) in turn quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26, 86 S. Ct. 1130, 1128-39, 16 L. Ed. 2d 218 (1966)); *see Cossette v. Minnesota Power & Light*, 188 F.3d 964, 973 (8th Cir. 1999) ("A district court may exercise

supplemental jurisdiction over state law claims that arise from the same nucleus of operative fact as the plaintiff's federal claims and when the plaintiff would ordinarily be expected to try all the claims in one judicial proceeding.") (citing *Kansas Public Employees Retirement Sys.*); *Meyers v. Trinity Med. Ctr*, 983 F.2d 905, 907 (8th Cir. 1993); *Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1005 (8th Cir. 1990); *Appelbaum v. Ceres Land Co.*, 687 F.2d 261, 262-63 (8th Cir. 1982); *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 578 F.2d 727, 734-35 (8th Cir. 1978). In sum, supplemental jurisdiction under subsection (a), is appropriate where the federal-law claims and the state-law claims in the case "derive from a common nucleus of operative fact" and are such that a plaintiff would ordinarily be expected to bring all of the claims in one suit. *See Kansas Public Employees Retirement Sys.*, 77 F.3d at 1067.

Once the court has determined supplemental jurisdiction is proper under subsection (a), subsection (c) provides the list of circumstances under which the court can decline to exercise such supplemental jurisdiction:

> **(c)** The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>> **(1)** the claim raises a novel or complex issue of State law,
>> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
>> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or
>> **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); *see International Ass'n of Firefighters of St. Louis, Franklin and Jefferson v. City of Ferguson*, 283 F.3d 969, 976 (8th Cir. 2002) (noting, without expressing an opinion as to what the district court should do on remand, that a district

court "would always be free . . . to proceed on the merits of the state claim, in its discretion, even if one of the conditions in 28 U.S.C. § 1367(c) for dismissal of the state claim had been satisfied."); *Southern Council of Industrial Workers v. Ford*, 83 F.3d 966, 969 (8th Cir. 1996) ("Where original jurisdiction exists, exercise of supplemental jurisdiction over all adequately related claims is mandatory absent certain exceptions . . . ."); *Tinius v. Carroll County Sheriff Dept.*, 255 F. Supp. 2d 971, 977 (N.D. Iowa 2003) ("'The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein.'") (quoting *McLaurin v. Prater*, 30 F.3d 982, 984 (8th Cir. 1994))

### 3. *Arguments of the parties*

#### a. *Arguments for dismissal*

##### i. *The Carl Anderson defendants*.

The Carl Anderson defendants contend that, on the face of the Complaint, they are in a wholly different position than the other named defendants—specifically: (1) there are no claims of fraudulent misrepresentation or fraudulent nondisclosure against the Carl Anderson defendants; (2) there is no claim that the Carl Anderson defendants conspired to defraud the plaintiffs; (3) there is no allegation that Carl Anderson knew that Schuster had suffered a stroke and was mentally impaired; (4) there is no allegation that the Carl Anderson defendants were involved in fraudulently inducing loans or investments from the plaintiffs; (5) there is no claim that Carl Anderson breached a fiduciary duty to the plaintiffs. Further, no federal statute provides a basis for jurisdiction over the subject matter of the plaintiffs' claims against the Carl Anderson defendants in Counts II and III. The Carl Anderson defendants argue that any exercise of supplemental jurisdiction over the claims against them would be unjust for the following reasons: (1) forcing the Carl Anderson defendants to defend against simple negligence claims in front of the same jury that hears evidence of the other defendants' fraudulent and

sinister conduct would make a jury more likely to find against the Carl Anderson defendants; (2) the nature of the other claims in the controversy are such that the case will likely be pending for years, and involve many hours of travel, depositions, and document review—and it would be unfair to require the Carl Anderson defendants, against who only simple negligence claims have been plead, to withstand such an expense of time and undue financial strain; (3) the plaintiffs have an adequate forum for these simple negligence claims in the Iowa District Court for Plymouth County; (4) trial of the Carl Anderson defendants with the Anderson defendants would foster an illusion of collusion for the mere fact that defendant Fay Anderson is Carl Anderson's father; and (5) recovery against the other defendants in the case will not, in any way, shape the plaintiffs' entitlement to recovery against the Carl Anderson defendants.

Turning to the Counts in question, the Carl Anderson defendants contend that if Fay Anderson had nothing to do with the preparation of Schuster Co.'s tax returns as alleged in Count II, then the preparation of those returns would be outside the purview of the court's subject matter jurisdiction as it does not relate to the common nucleus of operative fact to which the federal claims are tied. Likewise, Count III should be dismissed on that same basis—lack of any tie to the common nucleus out of which all of the other claims arise. The Carl Anderson defendants request that in the event that the court is troubled by the alleged connection between the Anderson defendants and the Carl Anderson defendants alleged in Count II, that the court allow Carl Anderson to revisit this issue after some limited discovery so that he can demonstrate that the allegations in Count II pertain only to him and not to Fay Anderson.

*ii.* ***The Anderson defendants***. The Anderson defendants assert that exercise of supplemental jurisdiction over Count I of the Complaint is improper. The Anderson defendants assert that a court can exercise supplemental jurisdiction over state law claims

where both the state and federal law claims present one case—or, in other words, arise under a common nucleus of operative fact. The Anderson defendants contend that no common nucleus exists between Count I and the remaining counts in the Complaint. Specifically, that there is no connection between the Anderson defendants allegedly fraudulent scheme to defraud the plaintiffs, and their preparation of federal and state taxes for Schuster. The Anderson defendants contend that questions of negligent tax preparation are factually distinct from the RICO claims, and are completely separate legal and evidentiary questions. Further, the Anderson defendants note that judicial economy would be subverted by hearing the unrelated tax claims as part and parcel of the rest of the claims in the Complaint, and also that inclusion of Count I in this litigation could lead to confusion and significantly prolonged discovery on such a collateral issue. Finally, the Anderson defendants contend that they would be unfairly prejudiced by the submission of evidence related to Count I as it will be used by the plaintiffs to attempt to bolster the RICO claims.

Turning to Count II, the Anderson defendants also claim that it should be dismissed for lack of subject matter jurisdiction. The Anderson defendants assert that the plaintiffs have not plead anything to connect them to Schuster Co.'s tax returns for the years stated and the claim is unrelated to the nucleus of operative fact under which the remaining claims in the Complaint arises. Further, the Anderson defendants argue there is no connection in the Complaint between the alleged fraudulent scheme and activities asserted and the failure to properly prepare tax forms for Schuster Co. Additionally, the Anderson defendants contend that the allegations in Count II have no relationship to the claims under which the plaintiffs purport this court has original jurisdiction—the civil RICO claims. Evidencing the lack of connection, according to the Anderson defendants, is the fact that Schuster Co. is not a plaintiff in any of the other causes of action proffered in the

Complaint. In sum, the Anderson defendants request dismissal of both Counts I and II for lack of subject matter jurisdiction.

### b.    The plaintiffs' arguments in resistance

Plaintiffs Schuster, Schuster Co. and LTT—hereinafter, collectively referred to as the "plaintiffs" in this portion of the order—resist the dismissal of Counts I-III for lack of supplemental jurisdiction under § 1367. The plaintiffs, relying on this court's analysis in *Tinius v. Carroll County Sheriff Department*, 255 F. Supp. 2d 971 (N.D. Iowa 2003), state that the state law claims and the federal law claims need only be "loosely connected" to be considered the "same case or controversy" justifying supplemental jurisdiction. Plf.s' Resistance at 21 (quoting *Tinius*, 255 F. Supp. 2d at 977). Further, the plaintiffs contend that once this loose connection is established, the court must exercise supplemental jurisdiction unless one of the four exceptions found in § 1367(c) is met. The plaintiffs contend that applying these principles, as set forth in *Tinius*, to Counts I-III, it is clear that supplemental jurisdiction exists.

With regard to Count I, the plaintiffs contend that central to the federal claims conferring original jurisdiction upon this court—the civil RICO claims—is Schuster's contention that he justifiably relied on fraudulent misrepresentations of the Anderson defendants in investing personal assets and loan proceeds in fraudulent entities and schemes recommended by Anderson. The plaintiffs contend that in order to establish this reliance, Schuster will be required to present evidence as to his long-standing relationship with Anderson as his personal accountant and the accountant for Schuster Co. and LTT, and the investment advice Anderson provided to Schuster and Schlichte. The plaintiffs contend that this fraudulent investment advice, in addition to providing a basis for the RICO claims, also provides the basis of the professional negligence in properly preparing Schuster's individual federal and state tax returns in Count I.

Turning to Count II, the plaintiffs claim that as Schuster is a shareholder in Schuster Co., the information reflected in Schuster's tax returns (the subject of Count I) is in part derived from Schuster Co.'s tax returns—therefore, making it impossible to consider the tax returns of Schuster and Schuster Co. in isolation. The plaintiffs argue that as the negligent investment advice ties Count I to the RICO claims, and as the subject matter of Counts I and II is intertwined, "it is impossible to consider the malpractice claim under Count I without considering the malpractice claim alleged under Count II." Plf.s' Resistance at 23.

The plaintiffs further aver that the claims against the Carl Anderson defendants are related to the RICO claims in two respects. First, the plaintiffs believe that during one or more of the tax years set forth in Count II, Carl Anderson was employed by either F.H. Anderson Company, P.C. or F.H. Anderson Company and worked on one or more of Schuster Co.'s tax returns identified in Count II. Therefore, if the Anderson defendants' malpractice claims in preparing the tax returns are loosely related to the RICO claims, then Carl Anderson's participation in preparing those same returns is also loosely related to the RICO claims. Second, considering the relationship between Counts I and II, principles of economy and convenience would mitigate in favor of trying the accounting malpractice claim in Count III with Counts I and II in one case.

Finally, the plaintiffs contend as Counts I, II and III are factually related to the RICO claims, the court can only decline to exercise supplemental jurisdiction over Counts I through III if one of the four exceptions in § 1367(c) apply. The plaintiffs contend that none of these exceptions apply as Counts I through III do not embody novel or complex issues of Iowa law, they are not the predominate claims in the lawsuit, and there is no compelling reason for declining jurisdiction. Further, the plaintiffs agree that should the court dismiss the RICO claims, the third exception would apply and Counts I through III

should be dismissed. However, in the plaintiffs' view, the RICO claims will not be dismissed, and therefore this exception would be inapplicable.

### c.    *The Anderson, and Carl Anderson, defendants' reply*

In reply, the Carl Anderson defendants assert that they are *not* seeking dismissal based on any of the exceptions recognized in § 1367(c) as instances where the court may decline supplemental jurisdiction. Rather, the Carl Anderson defendants assert that they are arguing that dismissal is appropriate as Counts II and III do not meet the threshold requirement for exercise of supplement jurisdiction under § 1367(a)—that the professional negligence claims embodied in Counts I and II are not "so related to the claims in the action within such original jurisdiction they form a part of the same case or controversy . . . " 28 U.S.C. § 1367(a). The Carl Anderson defendants strenuously resist the argument proffered in the resistence to dismissal of Count II—that because the Anderson defendants were entwined in the RICO claims and fraudulent scheme, that by virtue of Carl Anderson's alleged employment by the Anderson defendants in preparing Schuster Co.'s tax returns, the claims against the Carl Anderson defendants are "loosely related" to the RICO claims attempts to impute liability to the Carl Anderson defendants for acts alleged—as, no matter what set of facts is plead, the Carl Anderson defendants cannot be liable by association for the wrongdoings of the Anderson defendants. In sum, the Carl Anderson defendants contend that the threshold prerequisite for supplemental jurisdiction—that the claims be part of the same case or controversy—is not met, and that the Carl Anderson defendants should not be forced to defendant against the professional negligence claims in Counts II and III in front of the same jury that will decide the outcome of the RICO claims.

In reply, the Anderson defendants adopt the arguments by the Carl Anderson defendants as supporting dismissal of Counts I and II for lack of subject matter

jurisdiction.

## 4.   *Analysis*

The threshold determination which the court must make at this juncture is whether the professional negligence claims against the Anderson defendants and Carl Anderson defendants in Counts I, II, and III of the Complaint arise from the same "nucleus of operative fact as the plaintiff[s'] federal claims," *Cossette*, 188 F.3d at 973,—for, if the professional negligence claims do not arise under the same "case or controversy," then supplemental jurisdiction is not proper in the first instance under § 1367(a) and the court never reaches the circumstances enumerated in subsection (c) for when the court should decline supplemental jurisdiction over state law claims that form the "same case or controversy" as the federal claims. 28 U.S.C. § 1367(a).[9]   The court first turns to

---

[9]The court notes that until recently, pendent party jurisdiction over the Carl Anderson defendants could have been subject to dispute. Pendent party jurisdiction is "jurisdiction over Parties not named in any claim that is independently cognizable by the federal court." *Finley v. United States*, 490 U.S. 545, 109 S. Ct. 2003, 104 L. Ed. 2d 593 (1989). In *Finley*, the United States Supreme Court held that "pendent party jurisdiction exists only where Congress has *affirmatively granted* such jurisdiction." *Alumax Mill Prods.*, 912 F.2d at 1006 (citing *Finley*, 490 U.S. at 551, 109 S. Ct. 2003). Further, this rule applied even where the claims against the original parties "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them [all] in one judicial proceeding." *Id.* at 1006 (quoting *Lockard v. Missouri Pacific R.R.*, 894 F.2d 299, 301 (8th Cir. 1990) (citation and quotation omitted). Under this rationale, the Eighth Circuit, in *Alumax Mills Products, Inc. v. Congress Financial Corporation*, 912 F.2d 996 (8th Cir. 1990), held that the civil RICO statutes did not authorize pendent party jurisdiction, and Congress's failure to affirmatively grant such a right resulted in the dismissal of the claims against the pendent parties. *Id.* at 1007; *see also Meyers v. Trinity Med. Ctr.*, 983 F.2d 905 (8th Cir. 1993) (finding, in cause of action arising prior to the effective date of the 1990 amendment to § 1367, that there was no federal jurisdiction over pendent parties where neither the federal question statute, the

(continued...)

(…continued)

federal civil rights statutes, or 42 U.S.C. § 1983—upon which original jurisdiction was based—contained the affirmative grant of pendent party jurisdiction required by *Finley*). However, in 1990 Congress amended § 1367(a) to allow supplemental jurisdiction over "claims that involve joinder or intervention of additional parties." 28 U.S.C. § 1367. The Eighth Circuit has viewed this amendment as "effectively overrul[ing] *Finley*," *Kaiser v. Memorial Blood Ctr of Minneapolis, Inc.*, 977 F.2d 1280, 1283 n.1 (8th Cir. 1992), and as calling into doubt "*Finley*'s continued viability where . . . the court's original jurisdiction is based on a federal question, not on the diversity of the parties." *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 937 (8th Cir. 1999); *see also Travelers Ins. Co. v. Intraco, Inc.*, 163 F.R.D. 554, 557 (S.D. Iowa 1995) (noting, in case that arose following the enactment of the 1990 amendment, that § 1367 "merges both pendent claim and pendent party jurisdiction into the concept of 'supplemental jurisdiction.'") (quoting *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995).

In *Exxon Mobil Corp. v. Allapath Service, In.*, ____ U.S. ____, ____ S. Ct. ____, ____ L. Ed. 2d ____, 2005 WL 1469477 (Jun. 23, 2005), the United States Supreme Court was faced with the question of "whether a federal court in a diversity action may exercise supplemental jurisdiction over additional plaintiffs whose claims do not satisfy the minimum amount-in-controversy requirement, provided the claims are part of the same case or controversy as the claims of plaintiffs who do allege a sufficient amount in controversy." *Id.* at *3. The answer to the specific question presented centered on interpretation of 28 U.S.C. § 1367. Though the resolution of the issue presented resulted in a fractured decision—in which there were two dissents—all members of the Court appeared to agree on one thing: that § 1367 overturned *Finley* and allowed pendent party jurisdiction. *Id.* at *9 ("[a]ll parties to this litigation and all courts to consider the question agree that § 1367 overturned the result in *Finley*."); *id.* at *18 (Stevens, J., joined by Breyer, J., dissenting) (stating that the legislative history behind § 1367(a) "demonstrates that Congress had in mind a very specific and relatively modest task—undoing this Court's 5-to-4 decision in *Finley v. United States*, 490 U.S. 545, 109 S. Ct. 2003, 104 L. Ed. 2d 593 (1989)"); *Id.* at *26 (Ginsburg, J., joined by Stevens, J., O'Connor, J., and Breyer, J., dissenting) ("The Court is unanimous in reading § 1367(a) to *permit pendent party jurisdiction* in federal-question cases, and thus, to overrule *Finley*.") (emphasis added). Based on the Court's statements in *Exxon Mobil*, this court adheres to the proposition that the 1990 Amendment to § 1367 overruled *Finley*, and holds that pendent party jurisdiction

(continued…)

consideration of the Carl Anderson defendants. At oral argument, the plaintiffs indicated that the claims against the Carl Anderson defendants were based on only technical accounting errors in preparing federal and state tax returns for Schuster Co. and LTT. The plaintiffs' arguments as to why the court has supplemental jurisdiction over the Carl Anderson defendants can be described as a "trickle down" effect: the allegations against the Anderson defendants in Count I are loosely related to the RICO claims; Count II against both the Anderson defendants and the Carl Anderson defendants is related to Count I as Schuster's individual tax returns (basis of Count I) and Schuster Co.'s tax returns (basis of Count II) overlap in some regard; therefore, Count II is loosely predicated on the RICO claims; and finally, Count III should be tried with Counts I and II under principles of economy and convenience. However, the fact still remains that Counts II and III involve the preparation of tax returns by parties not part of the RICO claims forming this court's original jurisdiction, and *for parties that are also not a part of the RICO claims*. At this juncture, the court's inquiry focuses on whether "a discernable overlap between the operative facts underlying the federal claims and those underlying the appended state claims" exists. *Hunt v. Up North Plastics, Inc.*, 980 F. Supp. 1042, 1044 (D. Minn. 1997). The contention that Count II is connected to the RICO claims due to Count II's connection to Count I, which the plaintiffs allege is connected to the RICO claims, is far to nebulous to provide such a "discernable overlap"—especially in this instance where neither the Carl Anderson defendants, Schuster Co. or LTT are parties to the federal RICO

---

[9] (…continued)
can be exercised where the claims asserted against the pendent parties are "so related to claims in the action within the original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Therefore, the court can exercise pendent party jurisdiction over the Carl Anderson defendants (non-parties to the RICO claims) if the claims are based on the same "case or controversy" under § 1367(a).

claims forming this court's jurisdiction. *Id.*; *see Cossette*, 188 F.3d at 973 ("A district court may exercise supplemental jurisdiction over state law claims that arise from the same nucleus of operative fact as the plaintiff's federal claims and when the plaintiff would ordinarily be expected to try all the claims in one judicial proceeding."). Further, claims of mere technical accounting errors in preparation of tax returns for entities that are not part of the RICO claims cannot be said to arise from the same common nucleus of operative fact as the RICO claims. Moreover, considerations of "judicial economy, convenience, and fairness" to the Carl Anderson defendants weigh against exercise of supplemental jurisdiction. *Hess v. St. Joseph Police Pension Fund*, 788 F.2d 1344, 1346 (8th Cir. 1986); *see Cossette*, 188 F.3d at 973 ("Although pendent jurisdiction rests within the district court's discretion, that discretion should be guided by considerations of judicial economy, convenience, and fairness to the litigants."). Subjecting the Carl Anderson defendants to the extensive discovery and pre-trial preparation that is inevitable in a complex controversy involving RICO allegations and many layers of fraud—when the only thread tying them to this case is the fact that plaintiff Schuster's tax returns (which the Carl Anderson defendants did not prepare) incorporated information gleamed from Schuster Co.'s tax returns that the Carl Anderson defendants allegedly negligently prepared—would be unduly burdensome. Further, the fact that defendant Carl Anderson is the son of Fay Anderson—a key player in most of the claims averring fraud as well as the RICO violations—could result in substantial jury confusion, or worse, could make the jury more likely to find against the Carl Anderson defendants merely because of the lineal connection to a defendant against which sinister and egregious conduct is alleged. Therefore, as Counts II and III against the Carl Anderson defendants do not form part of the same "case or controversy" as the facts underlying the federal RICO claims, the court **grants** the Carl Anderson defendants' motion to dismiss for lack of supplemental jurisdiction over these

counts.

The court now turns to the counts against the Anderson defendants.  Count II is a claim alleged by Schuster Co. against the Anderson defendants and Carl Anderson defendants for negligent preparation of state and federal tax returns.  Other than the fact that the Anderson defendants are also implicated in the RICO claims, the court can find nothing else to indicate that the facts predicating this professional negligence claim in any way overlap with the facts predicating the federal RICO claims. *See Hunt*, 980 F. Supp. at 1045 ("That the claims involve one or more common actors is, however, insufficient, without more to create a common nucleus of operative fact.").  Additionally, Schuster Co. is not a party to any claim other than the professional negligence alleged in Count II.  For these reasons, Count II, as to the Anderson defendants, does not arise under the "same case or controversy" as the federal RICO claims.  Further, as Counts II and III have already been dismissed as to the Carl Anderson defendants—which effectually dismisses the Carl Anderson defendants as parties in this suit entirely—the court finds that interests of judicial economy and convenience weigh in favor of denying supplemental jurisdiction as to Count II in relation to the Anderson defendants as well.  As to Count II, the Anderson defendants' motion to dismiss is **granted**.

Finally the court turns to Count I against the Anderson defendants—which is by far the closest call in determining whether the claim arises from the same nucleus of operative fact as the RICO claims.  In Count I, Schuster alleges the Anderson defendants were negligent in the following ways:

> a. Failing to explain to Schuster the tax consequences of potential losses from high risk investments, such as those recommended by Anderson and or Cleveringa, as more fully described earlier in the Complaint.
> b.  Failing to explain the income tax treatment of

investment interest expense paid on loans incurred to invest in or funds loaned to a startup company.

c. Failing to properly prepare Schuster's federal and state income tax forms for the tax years 2001, 2002, and 2003, and potentially earlier tax years.

Complaint at ¶ 72 (a)-(c). At first glance it is evident that Count I is unlike Counts II and III in that it encompasses more than the failure to properly prepare Schuster's tax returns, but also includes negligence in failing to properly inform Schuster of the tax consequences of investments and loans the Anderson defendants recommended—the same investments and loans that comprise the circumstance constituting fraud in the RICO claims. As Count I contains these additional negligence allegations, it is likely that declining supplemental jurisdiction over this claim would require duplicative evidence to be presented in both the state and federal forum—as proof of the "high risk" investments and "funds loaned to a startup company" would have to be established in both forums. In this instance, unlike Counts II and III, the court notes that both Schuster and the Anderson defendants are parties to the RICO claims securing original federal jurisdiction. Additionally, the court notes that both Schuster and the Anderson defendants are integral parties to the federal RICO claims. As such, the court finds that the allegations in Count I, at least in material part, "ar[ise] out of the same incidents and address[] the same course of conduct as the underlying" federal RICO claims. *Franklin v. Zain*, 152 F.3 d 783, 786 (8th Cir. 1998). As supplemental jurisdiction over Count I is proper under § 1367(a), the court must only decline to exercise that jurisdiction if one of the enumerated circumstances in § 1367(c) is present. Here, the only option would be "exceptional circumstances [in which there are] compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). The court does not believe that the circumstances generate any such exceptional circumstances. As such, the court **denies** the Anderson defendants' motion to dismiss insofar as it seeks dismissal

of the professional negligence claim in Count I for lack of supplemental jurisdiction.

### F.  Plaintiff Schuster's Motion For Leave To Amend

At oral argument on the defendants' motions to dismiss, the court granted the plaintiffs request to extend the deadline for the time in which they had to file an amended complaint for the sole purpose of adding federal and state securities claims.  The day after oral argument, plaintiff Schuster filed a Motion For Leave To File A Third Amended And Substituted Complaint (Doc. No. 71), in which he requests he be granted leave to file a Third Amended and Substituted Complaint which: (1) adds federal and state securities law claims; (2) reinstates a claim for conversion; (3) inserts federal securities law violations as predicate acts under the RICO counts; and (4) inserts the material in the plaintiffs' resistance to the defendants' motions to dismiss and the information currently encapsulated in footnotes in the Complaint into the body of the Third Amended and Substituted Complaint.  ASB filed a resistance to this motion on July 5, 2005. (Doc. No. 72).  The plaintiffs filed a reply to ASB's resistance on July 8, 2005. (Doc. No. 73).  Although the court is cognizant of the concerns raised by ASB in its resistance, for the same reasons stated *supra*, Part II.B.5 for allowing the plaintiffs to file a Third Amended and Substituted Complaint to rectify the deficiency in the RICO claims, the court **grants** the plaintiffs' motion.

### III.  CONCLUSION

For the aforementioned reasons, as to the RICO claims in Counts XIV, XV, and XVI, the court finds that the plaintiffs have plead with the particularity required by Rule 9(b) and that the plaintiffs may assert RICO claims against ASB as a "person" under a respondeat superior theory of liability—therefore, to the extent the defendants' motions to

90

dismiss challenge the RICO claims on these grounds they are **denied**. *See* Doc. Nos. 54, 55, 56. However, the court finds that the plaintiffs have failed to state a claim for which relief can be granted under Rule 12(b)(6) by inadequately pleading the "enterprise" requirement. Therefore, the defendants' motions to dismiss as to Counts XIV, XV, and XVI are **granted** to the extent that the plaintiffs must, **by August 31, 2005**, **file a Third Amended and Substituted Complaint** remedying this deficiency. *See* Doc. Nos. 54, 55, 56.

The Anderson defendants' motion to dismiss (Doc. No. 55), to the extent that it seeks dismissal of the fraudulent misrepresentation and fraudulent nondisclosure claims, in Counts VI and VII, for failure to plead with the particularity required by Rule 9(b), and dismissal of the breach of fiduciary duties claims in Counts IV and XX under Rule 12(b)(6), is **denied**.

The motion by the Carl Anderson defendants (Doc. No. 52) seeking dismissal of the professional negligence claims in Counts II and III for lack of supplemental jurisdiction is **granted.** The Anderson defendants' motion to dismiss (Doc. No. 55)—to the extent that it seeks to dismiss the professional negligence claims in Counts I and II for lack of supplemental jurisdiction—is **granted** as to Count II and **denied** and to Count I. As Counts II and III are the only Counts in which the Carl Anderson defendants are named as parties, Carl Anderson and Anderson Accounting & Tax Services, Inc. are, by virtue of this ruling, dismissed from this controversy. Further, as Schuster Co. and Le Mars Truck and Trailer, Inc., are only named plaintiffs in Counts II and III, respectively, by virtue of this ruling they are also removed as parties from this controversy. **Counts II and III are dismissed without prejudice to refiling in state court.**

The plaintiffs' Motion For Leave To File A Third Amended And Substituted Complaint (Doc. No. 71) is **granted**. The plaintiffs must file a **Third Amended and**

**Substituted Complaint on or before August 31, 2005** that rectifies the deficient pleading of the "enterprise" requirement in Counts XIV, XV, and XVI. In the interest of economy to the parties and the court, such an amended complaint may rectify any inadequacies perceived in the pleading of other claims not addressed in this order, and may also assert additional claims and amend existing claims including, *but not limited to*, the: (1) addition of state federal and state securities law claims; (2) insertion of federal securities law violations as predicate RICO acts; (3) reinstatement of a conversion claim; and (4) insertion of the details in the footnotes of the Second Amended and Substituted Complaint and the Plaintiffs' Brief in Resistance to Defendants' Motion to Dismiss. Within the appropriate time following the plaintiffs' filing of the Third Amended and Substituted Complaint, the defendants may again file motions to dismiss on any perceived infirmity.

  **IT IS SO ORDERED.**

  **DATED** this 12th day of July, 2005.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA